[L.A. No. 30898. Aug. 10, 1979.]

RICHARD BARBER et al., Petitioners, v.
THE MUNICIPAL COURT FOR THE SAN LUIS OBISPO COUNTY
JUDICIAL DISTRICT OF SAN LUIS OBISPO COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Richard A. Frishman for Petitioners.

Fred Okrand and John M. Sink as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., William R. Weisman, Deputy Attorneys General, Robert N. Tait, District Attorney, and Gerald T. Shea, Deputy District Attorney, for Real Party in Interest.

OPINION

**BIRD, C. J.**—This court must decide what is the proper remedy for an accused when his constitutional right to counsel has been denied by the actions of an undercover police officer who poses as a codefendant and attends the confidential attorney-client conferences of the accused.

I

On August 7, 1977, approximately 50 people, including all of the petitioners, participated in a "sit-in" near the site of the Pacific Gas and Electric Company's (hereafter, P.G. & E.) Diablo Canyon nuclear facility to demonstrate their opposition to the use of nuclear power to generate energy. The petitioners were arrested and each was charged with two counts of trespassing. (Pen. Code, §§ 602, subd. (k) and 602, subd. (n).) All of the petitioners, except U'ren and Rosenburg, were also charged with one count of unlawful assembly. (Pen. Code, § 409.)

On October 4, 1977, before the date set for trial of these cases, petitioners learned that one of the codefendants was an undercover police officer. They moved to dismiss on the grounds that presence of the agent at confidential attorney-client meetings had deprived them of their rights to the effective assistance of counsel and due process of law.

At the hearing on the motion the following testimony was received:

Several weeks prior to the demonstration, advertisements were placed in local newspapers inviting the public to attend meetings at which opposition to the Diablo Canyon nuclear facility and plans for the demonstration were to be discussed. The meetings were sponsored by a national organization, the Abalone Alliance, and a local group, People Generating Energy, both opposed to the use of nuclear power to generate energy.[1]

Two officers, Detective C. D. Smith of the Santa Barbara County Sheriff's Department and reserve Deputy Sheriff James Lee of the San Luis Obispo County Sheriff's Department, were assigned by their respective employers to attend the meetings in an undercover capacity in order to learn more about the group, the plans for the demonstration, and to ascertain whether there would be any violence at the demonstration.[2]

Both officers became intimately involved with the group and attended numerous meetings at which plans for the demonstration were discussed. At all of these meetings it was strongly emphasized that the group was committed to nonviolence and at none of these meetings was there any indication that the demonstration would be anything other than peaceful and nonviolent. The two officers also attended an all-day "nonviolent training" session, attendance at which was required for those who would actually participate in the sit-in. At this meeting the participants engaged in various role-playing sessions designed to teach the participants how to react nonviolently to stress situations which might be encountered with police officers.[3]

Prior to the demonstration, representatives of the group asked to meet with members of the San Luis Obispo County Sheriff's Department and representatives of P.G. & E. Two meetings were held at which the representatives of the group told the sheriff's department and P.G. & E. officials of the plans for the demonstration, including the time it was to be

---

[1] Petitioners are members of either the national or the local organizations.

[2] Although Lee knew Smith was an undercover officer, Smith was not aware that Lee was a peace officer.

[3] The only indication of the possibility of violence was attributed to Officer Lee. At the all-day training session he stated that he was not sure he would react nonviolently to police officers. Also, immediately prior to the demonstration, members of the group discovered that Officer Lee was carrying a large knife. He was persuaded to disarm himself.

held, the route to be taken and the number of people to be involved.[4] They also stressed the group's commitment to nonviolent demonstration.

On August 3, 1977, at the request of the county district attorney's office, Judge Conklin, Presiding Judge of the Municipal Court for the San Luis Obispo Judicial District, met in the district attorney's office with several deputy district attorneys and sheriff's officers. At this meeting the planned demonstration was discussed. Judge Conklin was informed that there would be violations of certain provisions of the Penal Code. Decisions were made to arraign the arrestees on the same day of the arrests in the county jail auditorium and to release all of them without bail whether or not they signed O.R. release forms.

On August 7th, the demonstration occurred as planned. About 50 people, including petitioners and Officers Lee and Smith, accompanied by approximately 75 to 100 news media people, crossed over two fences and entered an access road maintained by P. G. & E.[5] The group proceeded on the access road to a point about one-half mile from the main entrance and six and one-half miles from the power plant. After warnings to disperse were given, the demonstrators were arrested.[6] The arrestees were transported to the county jail, where petitioners and Officer Lee were booked and charged.[7]

Attorneys Haynes and Stone, having been asked to represent the group, arrived at the jail to consult with the arrestees, including Officer Lee. Officer Lee was present at this confidential attorney-client conference and testified that he was sure defense strategy was discussed but was not paying close attention.

---

[4] The group had originally intended to march directly to the front gate of the P.G. & E. property. Officer Lee was strongly opposed to such a direct route and encouraged the group to plan "circumventing" routes. He also adamantly opposed the group's decision to inform the sheriff's department of the plans for the demonstration. He stated that the group was giving the sheriff's department too much information.

[5] An additional 12 to 15 group members accompanied the demonstrators. According to Officer Smith's testimony, these members were acting as monitors for the demonstrators and their purpose was "to be like buffers, to keep outside agitators from provoking or causing violence or creating a disturbance."

[6] The officers involved in the arrests testified that the demonstration had been very peaceful and nonviolent and that no problems had been encountered in effectuating the arrests.

[7] Officer Smith was released shortly after arriving at the jail and was not involved in any of the events which occurred thereafter.

Judge Conklin arrived at the jail at 6 p.m. for the arraignments. However, the proceeding did not begin until 8:30 p.m. While he was waiting to begin, he had numerous discussions about the cases with members of the sheriff's department and the district attorney's office.[8] During some of the discussions, defense attorneys were present; during others, they were not. Judge Conklin learned that evening that some of those arrested were undercover police officers. Defense counsel were not present when he was told this information and he did not inform them that some of their clients might be undercover officers.

Detective Doug Mansfield, Officer Lee's immediate supervisor, testified that he informed Deputy District Attorney Shea the day after the demonstration that defendant Lee was a police officer. Shea did not inform defense counsel.

Officer Lee continued to pose as a codefendant with petitioners and as a client of the firm of Haynes and Olpin. As such, he attended numerous confidential attorney-client conferences, all of which "went into detail" about various aspects of the cases, including defense strategy. Lee testified he participated in discussions "about the defense in general" but did not recall discussing his "personal defense."

On one occasion Attorney Stone asked for volunteers to accompany her to inspect the site of the demonstration. Lee was one of two defendants who volunteered and thereby became involved in the strategy discussion occurring at the scene. On another occasion, defense counsel asked that one of the group draw a map of that area. Lee again volunteered to do so. He prepared a detailed map of the fences and gates on the site, but failed to show the presence of an opened gate at a key location. Officer Lee testified that he had not intentionally omitted the gate and did not intend to mislead the petitioners.[9] Lee admitted, however, that prior to drawing the map, he had inspected the site with his superiors.

Attorney Stone testified that she inspected the site after Lee had given her the map but failed to notice the presence of the gate. She testified that

---

[8]Judge Conklin testified that at no time did he discuss the merits of the cases with the prosecutors.

[9]The presence or absence of the opened gate could have been crucial at the trial of petitioners in the case of *In re Johnson. (Post,* at p. 769[157 Cal.Rptr. 674, 598 P.2d 834].) Had they known of the gate, they would have been able to argue that the area on which the demonstration took place was not fully enclosed or posted, as required by Penal Code section 602, subdivision (k).

the inspection had consisted of being driven though the site of the demonstration by P.G. & E. officials. She testified that although P.G. & E. had later furnished defense attorneys with maps of the area, these were geographical maps and did not show any fences or gates. She gave Lee's map to the present attorney in the case when he substituted as defense counsel.

From the time of the arrest on August 7th to October 4th, Lee reported to Detective Doug Mansfield or Captain Wood. Most of the information that Lee communicated to his superiors was communicated orally, either by telephone or in person. Lee filed only one written report during that period. Lee's superiors testified that, although they could not remember what information Lee gave them, they were sure he gave them no information about defense strategy. Lee stated that he informed his superiors that the defense was to become more "political." All three officers testified that they did not discuss Lee's reports with any members of the district attorney's office.

The sheriff's department justification for maintaining Lee in his undercover assignment after the arrests was to gain information about possible infiltration of the group by terrorists or to learn of plans for future violent demonstrations by the group. The officers testified that, although the group had informed them that they planned another demonstration sometime in January 1978, there was no indication of any terrorist infiltration or advocacy of violence by any member of the group.

At one point Officer Lee decided he would enter a plea of nolo contendere on October 4th and remove himself from the court proceedings. He mentioned these plans on October 1st to some of the defendants but did not discuss them with any of the attorneys. Shortly before October 4th, however, the group decided to substitute new counsel and pursue a more "political" defense. Lee then decided not to enter the plea because, he claimed, he was not sure of the "legal ramifications" of entering a plea while represented by the new attorneys. He admitted that he had no intention of discussing these "legal ramifications" with new counsel; he intended instead to talk to Detective Mansfield.

Sometime during October 4th, Judge Conklin informed new counsel that one of his clients was an undercover police officer. The next day an article appeared in the local paper revealing Lee's true identity.

The new attorney, Frishman, found that after the undercover status of Officer Lee was revealed, petitioners' actions were "characterized, if you can use the word, by paranoia concerning the use of informants by the state." Whereas prior to the revelation petitioners very actively participated in meetings with their former counsel, since that time they "have been most reluctant to speak out at defense meetings." The petitioners have become very distrustful of one another and have even questioned the identity of Frishman's law student assistant, fearing that there may be other undisclosed, undercover agents still amongst them. Attorney Frishman concluded that he had "found that the defendants' ability to proceed with their defense and to assist [him] in preparing their defense has been substantially impaired [and that] the impairment has been caused by the use of informants [sic] in this case."

The trial court denied the motion to dismiss on the grounds that there had been no evidence to show that information gained by Officer Lee had been transmitted to the prosecution. However, the court ordered "that the people may not use any evidence obtained by Mr. Lee or that was derived from his presence at any meetings between counsel, either previous counsel, present counsel or future counsel, if such be the case, nor the fruits thereof may not be used in evidence, and that they may not in rebuttal to any evidence put forth by the defendants, use any evidence whatsoever unless the prosecution can first prove beyond a reasonable doubt that such evidence was obtained independently of the activities of Mr. Lee."

This writ petition followed.

## II

■ The right to counsel is guaranteed to a defendant in a criminal case by both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This right is a "fundamental constitutional right, which has been carefully guarded by the courts of this state." (*In re James* (1952) 38 Cal.2d 302, 310 [240 P.2d 596]; *People* v. *Douglas* (1964) 61 Cal.2d 430, 434 [38 Cal.Rptr. 884, 392 P.2d 964]; *People* v. *Carter* (1967) 66 Cal.2d 666, 669 [58 Cal.Rptr. 614, 427 P.2d 214].) "Meaningfully applied, the right to counsel includes the opportunity to receive 'effective aid [of counsel] in the preparation and trial of the case.' [Citations omitted.]" (*People* v. *Douglas, supra,* 61 Cal.2d at p. 434; *People* v. *Carter, supra,* 66 Cal.2d at p. 669.)

In order to insure that a criminal accused receives the effective assistance of counsel, the constitutional guarantee imposes a duty on defense attorneys "to investigate carefully all defenses of fact and of law that may be available to the defendant. . . ." (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) This duty to investigate requires that counsel gather as much information as possible about the case, including facts concerning the acts charged, possible defenses, and the accused's background and prior record. A primary source of such information is the accused himself. Often, whether guilty or innocent of the offense charged, the accused knows facts pertinent to his defense which may tend to incriminate or embarass him. However, "[a]s a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." (*Fisher* v. *United States* (1976) 425 U.S. 391, 403 [48 L.Ed.2d 39, 51, 96 S.Ct. 1569].) ██ Thus, if an accused is to derive the full benefits of his right to counsel, he must have the assurance of confidentiality and privacy of communication with his attorney.

It is for this reason that the courts have recognized that the right to counsel guaranteed by the California Constitution embodies the right to communicate in absolute privacy with one's attorney. Former article I, section 13 (now art. I, § 15) of the California Constitution "unquestionably was adopted to secure to the accused person all the benefits which may flow from the employment of counsel to conduct his defense. To afford him those benefits it is essential that he should be allowed to consult with his counsel, not only during the actual trial, but prior thereto, in order to prepare for his defense. . . . It is equally essential to the enjoyment of this constitutional guarantee that the accused should have the right to a *private* consultation with his counsel. . . . 'If the right of defense exists, it includes and carries with it the right of such freedom of action as is essential and necessary to make such defense complete. In fact, there can be no such thing as a legal trial, unless both parties are allowed a reasonable opportunity to prepare to vindicate their rights. . . . It therefore necessarily follows that it is the absolute right of parties charged with crime to confer privately with their attorneys. . . .' " (*In re Rider* (1920) 50 Cal.App. 797, 799-800 [195 P. 965]; accord *In re Jordan* (1972) 7 Cal.3d 930, 941 [103 Cal.Rptr. 849, 500 P.2d 873]; *Cornell* v. *Superior Court* (1959) 52 Cal.2d 99, 102-103 [338 P.2d 447, 72 A.L.R.2d 1116]; *In re Qualls* (1943) 58 Cal.App.2d 330, 331 [136 P.2d 341]; *In re Snyder* (1923) 62 Cal.App. 697, 699-700 [217 P. 777].)

The right to counsel, which embodies the right to private consultation with counsel, is violated when a state agent is present at confidential attorney-client conferences. (*In re Rider, supra,* 50 Cal.App. 797 [the constitutional right to counsel is denied when a juvenile court ward, in custody at juvenile hall, was not permitted to consult with her attorney except in the presence of the superintendent or his agent]; *In re Snyder, supra,* 62 Cal.App. 697 and *In re Qualls, supra,* 58 Cal.App.2d 330 [the right to counsel is violated by prison regulations requiring attorney-client conversations to take place through a wire mesh screen and in the presence of other attorneys and their clients, who could overhear nearby conversations]; see also *In re Jordan, supra,* 7 Cal.3d 930 [striking down prison regulations permitting prison officials to read attorney-client correspondence].)

In addition to the constitutional right to consult privately with counsel, there are numerous legislative enactments designed to protect the confidentiality of attorney-client communications. For example, Business and Professions Code section 6068, subdivision (e) states: "It is the duty of an attorney: . . . (e) To maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client." Evidence Code section 954 grants a client "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer. . . ." Penal Code section 636 makes it a felony for anyone to eavesdrop or record "a conversation" between "a person who is in the physical custody of a law enforcement officer . . . and such person's attorney. . . ." As this court has noted, "the protection of [client] confidences and secrets is not a rule of mere professional conduct, but instead involves public policies of paramount importance which are reflected in numerous statutes." (*In re Jordan, supra,* 7 Cal.3d at pp. 940-941.)

Respondent contends that these principles do not apply to the present case for several reasons. First, it argues, the intrusion of a state agent into confidential attorney-client communications does not violate the right to counsel if the purpose for the intrusion is to detect future crimes rather than to discover defense strategy. This argument has been previously rejected by our courts. In *In re Snyder, supra,* and *In re Jordan, supra,* the state asserted that the intrusions in those cases[10] were justifiable to detect

---

[10] In *Snyder,* the intrusion was a wire mesh screen between attorney and client, which prevented papers from being passed back and forth and made reading of documents through the screen difficult. In *Jordan,* the intrusion consisted of state agents reading mail from attorneys to prisoners or prisoners to attorneys.

present crime, prevent future crime, and protect jail or prison security. In each case the court held that notwithstanding the duty of state officials to protect prison security, they must do so by means that do not interfere with the right of the accused to privacy of communication with counsel. "[W]e all realize that official duty, grave and important as it is, must be performed in subordination to the constitutional rights of others." (*In re Snyder, supra,* 62 Cal.App. at pp. 701-702; see also *In re Jordan, supra,* 7 Cal.3d at p. 939.)[11]

It is irrelevant to the reasons underlying the guarantee of privacy of communication between client and attorney that the state is intruding for one purpose rather than for another. "[T]he purpose and necessities of the relation between a client and his attorney require, in many cases, on the part of the client, the fullest and freest disclosure to the attorney of the client's objects, motives, and actions." (*In re Jordan, supra,* 7 Cal.3d at p. 940.) The chilling effect on full and free disclosure by a client would be the same, whatever the state's asserted purpose for intruding. The intruding state agent by his presence will be privy to confidential communications. Aware of this possibility, a client will be constrained in discussing his case freely with his attorney.

Respondent next contends that petitioners' discussions with their attorneys were not confidential because they openly discussed their cases in the presence of other defendants. ■ However, Evidence Code section 952 and the accompanying comment by the Law Revision Commission indicate that a client's communications with his attorney do not lose their confidential nature simply because they are made in the presence of joint clients. Section 952 provides that a "confidential communication between client and lawyer" includes information disclosed by a client to his attorney in the presence of third persons "who are present to further the interest of the client in the consultation or . . . to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted. . . ." The Law Revision Commission comments to this section state that "a communication to a lawyer is nonetheless confidential even

---

[11]See also cases collected in Annotation, Scope and Extent, and Remedy or Sanctions for Infringement, of Accused's Right to Communicate With His Attorney (1966) 5 A.L.R.3d 1360-1399, where, at page 1365, it is said: "One class of cases in which courts have had little difficulty in trying to strike a balance between liberty and authority involves 'eavesdropping' on counsel-client conversations, either by electronic devices installed in conference rooms or by means of paid informers who gain access to the privileged communications of the defense. In such instances, courts have not hesitated to rule as unconstitutional and in violation of the attorney-client privilege such underhanded methods of the prosecution."

though it is made in the presence of another person—such as a spouse, parent, business associate, or joint client—who is present to further the interest of the client. . . ." Thus, the fact that the petitioners discussed their defenses with joint counsel in a conference-type setting rather than in a one-on-one session does not diminish their right of confidentiality.[12]

Finally, respondent relies on a recent decision by the United States Supreme Court, *Weatherford* v. *Bursey* (1977) 429 U.S. 545 [51 L.Ed.2d 30, 97 S.Ct. 837]. In that case, both a defendant (Bursey) and an undercover agent (Weatherford) were arrested and prosecuted for vandalizing the offices of a local draft board. Each man was released on bond and retained a separate attorney. On two occasions the defendant Bursey and his attorney asked Weatherford to confer with them "in an effort to obtain [from Weatherford] information, ideas or suggestions as to [Bursey's] defense." Weatherford did accept these invitations but did not discuss with or pass on to his superiors or to the prosecution any details or information regarding Bursey's trial plans, strategy, or anything having to do with the criminal action pending against Bursey. (*Id.,* at p. 548 [51 L.Ed.2d at p. 35].) Weatherford remained in his undercover role until he "lost some of his effectiveness as an agent in the weeks preceding trial because he had been seen in the company of police officers. . . ." (*Id.,* at p. 549 [51 L.Ed.2d at p. 36].) Weatherford was called as a witness at Bursey's trial and he testified only to events occurring prior to their arrests. Following his conviction, Bursey filed suit against Weatherford and his superiors under 42 United States Code, section 1983, alleging he had been deprived by them of his right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution. A divided Supreme Court upheld the trial court's judgment in favor of Weatherford.

It is by no means clear that *Weatherford* would support respondent's position. Throughout the *Weatherford* opinion, the Supreme Court relied on factors which are significantly different from those in the present case:

[12]Respondent attempts to equate the actions of Undercover Agent Lee with a codefendant who has attended and participated in attorney-client meetings but who subsequently decides to cooperate with the prosecution. It is argued that petitioners must suffer the consequences of their misplaced confidences. However, it is one thing for an individual to be "betrayed" by an acquaintance or a private person with whom he has associated. It is another for the government deliberately to send out agents to do to its citizens by trickery what it may not do to them directly. "The difference between the risk of faithlessness that we all run when we choose our friends and the risk of faithlessness that we run when government foists a multiplying army of bribed informers on us may well be a matter of degree; but of such degrees is liberty or its destruction engineered." (Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn. L.Rev. 349, 407.)

(1) Weatherford retained separate counsel from Bursey, while Officer Lee retained the same attorney as petitioners.

(2) Weatherford attended the attorney-client conferences at the specific request of Bursey and for Bursey's sole benefit. Weatherford was not "instructed to intrude on the lawyer-client relationship" and had not "assumed for himself that task." (*Id.,* at p. 557 [51 L.Ed.2d at p. 41].) In this case, Officer Lee was instructed by his superiors to attend the attorney-client meetings. He was not specifically requested to attend by the defendants. His attendance was, ostensibly, as much for his personal benefit as for the benefit of the others.

(3) Weatherford communicated no information about the defense to his superiors. However, in the present case Officer Lee told his superiors that there was to be a "political" defense and that the defendants would attempt to postpone the trial.[13]

(4) In *Weatherford,* no "specific prejudice to the defendant's preparation for or conduct of trial [was] demonstrated or otherwise threatened." (*Id.,* at p. 550 [51 L.Ed.2d at p. 37].) In this case, there was evidence that since the disclosure of Lee's undercover role, petitioners had become reluctant to cooperate fully with their attorney.

Not only is *Weatherford* inapposite, it cannot be used as authority to justify the police action here since the right to privacy of communication between an accused and his attorney has consistently been grounded on California law. (Cf. *ante,* at pp. 752-753.) The first California case to expressly recognize that right was decided more than a decade before *Powell* v. *Alabama* (1932) 287 U.S. 45 [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527] made the Sixth Amendment's right to counsel applicable to the states in capital cases. (Compare *In re Rider* (1920) 50 Cal.App. 797 [195 P. 965]; *In re Snyder* (1923) 62 Cal.App. 697 [217 P. 777].) Moreover, the decisions in this area since *Powell* have relied on California law and have not referred to the federal Constitution.[14] (*In re Jordan, supra,* 7 Cal.3d 930; *In re Qualls, supra,* 58 Cal.App.2d 330.)

---

[13]Moreover, Officer Lee, unlike Agent Weatherford, actively participated in defense planning, including the preparation of a (faulty) map of the arrest site.

[14]The dissent by my colleague, Justice Clark, inaccurately asserts that this court "ultimately shift[s] ground" from the federal to the state Constitution in reaching its decision. Quite the contrary, this decision flows *directly* and *exclusively* from principles of California law—constitutional, decisional, and statutory—all of which predated *Weatherford.* (*In re Jordan, supra,* 7 Cal.3d 930; *Cornell* v. *Superior Court, supra,* 52 Cal.2d 99; *In*

The right under California law to communicate privately with counsel was violated when a government agent in an undercover capacity was present at confidential attorney-client meetings.[15]

## III

■ Next, this court must determine what relief should be given. Petitioners contend that an exclusionary remedy, such as the trial court applied in this case (cf. *ante,* at p. 750), is inadequate to protect their rights and will not deter the state from such unlawful intrusions in the future. This court agrees.

Whether or not the prosecution has directly gained any confidential information which may be subject to suppression, the prosecution in this case has been aided by its agent's conduct. Petitioners have been prejudiced in their ability to prepare their defense. They no longer feel they can freely, candidly, and with complete confidence discuss their case with their attorney. Petitioners' attorney testified that the discovery of the undercover agent's true identity resulted in a refusal by his clients to offer suggestions or criticize any aspect of the conduct of the cases. Distrustful of each other and fearing that any one of them might also be an undercover police officer, the petitioners have even questioned the true identity of defense counsel's law student assistant. This lack of cooperation, which resulted solely from the intrusion by law enforcement officers in the attorney-client relationship, has resulted in counsel's inability to prepare adequately for trial. To allow these cases to proceed to trial under these circumstances would be contrary to basic notions of fair play and simple justice.

re *Qualls, supra,* 58 Cal.App.2d 330; *In re Snyder, supra,* 62 Cal.App. 697; *In re Rider, supra,* 50 Cal.App. 797; Bus. & Prof. Code, § 6068, subd. (e); Evid. Code, §§ 915, 952, 954; Pen. Code, § 636.) The dissent somehow manages to reach its conclusions without dealing with, or even mentioning, any of this dispositive California law.

Even if this case were to be decided under federal law, the dissent's conclusion that there was no violation of the right to counsel would not be sustained. There is a significant legal distinction between an undercover agent who retains his own *separate* counsel (*Weatherford*) and one who retains the *same* attorney as his unsuspecting codefendants (*Barber et al.*); between an agent who attends an attorney-client conference at the specific *invitation* of his codefendant (*Weatherford*) and one who attends under the *instruction* of his government (*Barber*); between an agent who seeks a separate trial from his codefendants (*Weatherford*) and one who seeks a joint trial (*Barber*); and between an undercover agent who merely gives information, ideas, and suggestions to defense counsel (*Weatherford*) and one who volunteers to draw (inaccurately) maps for counsel and who reports the nature of the defense to his superiors.

[15]In view of this conclusion, it is not necessary to decide whether petitioners' rights to due process of law and against self-incrimination have also been violated.

Furthermore, the enforcement of an exclusionary rule would involve exceedingly difficult problems of proof for the aggrieved client. Subtle forms of prejudice are nearly impossible to isolate. Consider the prosecution witnesses who learn of some of the illegally obtained information. Even if the witnesses do not divulge the information to the prosecutor, the witnesses will be "in a position to formulate in advance answers to anticipated questions, and even to shade their testimony to meet expected defenses." (*Weatherford* v. *Bursey, supra,* 429 U.S. at pp. 561, 564 [51 L.Ed.2d at pp. 43, 45] (dis. opn. of Marshall, J.).) If, to use Justice Marshall's example, the undercover officer learned that the accused would use an entrapment defense, he could plan his testimony so as to minimize his own role and emphasize the accused's predisposition. (*Ibid.,* fn. 1 [51 L.Ed.2d at p. 45].) The accused, on the other hand, "would have . . . little time to reconstruct in his mind [the officer's] role in the decision to commit the crime once [the officer] testified he was the state agent." (*Ibid.*)

Even the blatant use of illegally obtained information will be difficult to prove. As Justice Marshall points out, "[p]roving that an informer reported to the prosecution on defense strategy will [seldom be possible], not only because such proof requires an informer or prosecutor to admit his own wrongdoing (and open the door to damage suits and attacks on convictions), but also because an informer's failure to make a report after overhearing a lawyer-client session oftentimes can be an effective means of communicating to the prosecutor that nothing surprising was uncovered." (*Id.,* at p. 565 [51 L.Ed.2d at p. 46].)[16]

---

[16]My colleague, Justice Manuel, asserts an aggrieved client will have no problems of proof because under an exclusionary rule it would be the prosecution that must prove an independent source beyond a reasonable doubt for its evidence. However, this contention overlooks the difficulties and dilemmas facing a client and his lawyer. If the accused has to put forward evidence of his own in order to attack or impeach the prosecution's claim of lack of taint, then the accused is forced to give up his Fifth Amendment rights. Moreover, this argument ignores the real fact that many forms of prejudice do not logically lend themselves to an exclusionary remedy.

The concurring and dissenting opinion further suggests that "[a]bsent jeopardy, violations of constitutional rights do not gain an accused immunity from punishment." That is not quite the law. Dismissal of a pending prosecution is the well-established remedy for a number of constitutional violations, including a violation of the right to a speedy trial. (See, esp., *Strunk* v. *United States* (1973) 412 U.S. 434 [37 L.Ed.2d 56, 93 S.Ct. 2260].) This is true even if there has been no affirmative showing of prejudice to the accused. (See *Moore* v. *Arizona* (1973) 414 U.S. 25 [38 L.Ed.2d 183, 94 S.Ct. 188].) Similarly, a dismissal is required upon the failure of the prosecution to disclose or remain in contact with an informant who merely *might* give exculpatory evidence on the issue of guilt or innocence. (See, e.g., *Eleazer* v. *Superior Court* (1970) 1 Cal.3d 847 [83 Cal.Rptr. 586, 464 P.2d 42].) Moreover, one Court of Appeal specifically held that dismissal, rather than the exclusion of evidence, was the appropriate remedy where the prosecution

Finally, enforcement of an exclusionary remedy would place an accused in a Catch-22 situation, because in order to protect his confidences, the client would have to permit them to be re-violated. For a trial court to intelligently pass upon the question whether the prosecution has met its burden of showing that certain proferred evidence is not a fruit of or tainted by the illegally obtained information, the court would have to be advised—by competent evidence on the record—as to the illegally obtained information. It would be unreasonable for a judge to rule on whether the tendered evidence is a fruit of illegally obtained information without knowing the substance of the illegal information, i.e., what agent Lee observed or overheard. Yet, advising the court on the record of the nature of the conversation or the illegally obtained information requires a re-disclosure of the confidential communication.[17] That re-disclosure must be made not only to the trial court, but also to the prosecutor who would thereby learn the defense strategy, if he had not learned it earlier.[18] Clearly, an exclusionary remedy would be illusory, since the client could not be assured that he has been insulated from harm without requiring him to reopen the wound his adversary inflicted upon him in the first place.[19]

interferred in the attorney-client relationship. (*People* v. *Moore* (1976) 57 Cal.App.3d 437 [129 Cal.Rptr. 279].)

[17]Requiring such a re-disclosure would also be in direct violation of Evidence Code, section 915, which provides in pertinent part: "(a) Subject to subdivision (b), the presiding officer may not require disclosure of information claimed to be privileged under this division in order to rule on the claim of privilege." The Law Revision Commission comments to this section state: "Subdivision (a) states the general rule that revelation of the information asserted to be privileged may not be compelled in order to determine whether or not it is privileged. This codifies existing law. [Citations.]"

[18]Indeed, it seems a patent violation of an accused's right against self-incrimination to require him to elicit evidence of defense strategy in this manner in order to protect his right to a trial free from taint.

Moreover, consider the dilemma of a client who hears an undercover agent testify falsely on what defense strategy was discussed. Would the client take the witness stand to impeach the agent by recounting the true defense strategy?

[19]Neither of the dissenting opinions squarely meets this central issue. How may a meaningful exclusionary remedy be adequately enforced without violating Evidence Code section 915 or the privilege against self-incrimination and without reviolating the attorney-client privilege? This problem is carefully avoided by the dissenters.

Instead, the dissent by Justice Clark erroneously suggests that in *Weatherford* the Supreme Court rejected a "reversal per se" sanction for this type of violation of the right to counsel. That suggestion is fallacious, since the issue of *remedy* for a violation of the right to counsel in a criminal case was not before the court in *Weatherford*. Rather, the court found there had been no violation of the federal Constitution at all. It never reached the question whether, had there been a violation, an exclusionary remedy was preferable to a dismissal. Indeed, since the *Weatherford* case was a *civil* suit brought *after* the defendant's conviction was final, the question of the appropriate remedy in criminal cases would not have come before the court even if it had found a violation of the Sixth Amendment. Thus, *Weatherford* simply is not informative on the question of what remedy is appropriate when a violation of the Constitution has in fact occurred.

The exclusionary remedy is also inadequate since there would be no incentive for state agents to refrain from such violations. Even when the illegality is discovered, the state would merely prove its case by the use of other, untainted evidence. The prosecution would proceed as if the unlawful conduct had not occurred.

Respondents rely for their exclusionary remedy on *Wilson* v. *Superior Court* (1977) 70 Cal.App.3d 751 [139 Cal.Rptr. 61]. In that case, police officers surreptitiously tape-recorded a conversation in jail between an inmate awaiting trial and his attorney. The Court of Appeal found this to be "an outrageous violation of [the accused's] most fundamental constitutional rights . . . [that] poses a potential threat to the rights of each of us." (*Id.,* at p. 758.) However, it held that the prosecution could continue if there remained "sufficient evidence to maintain a prosecution which is neither derived from nor tainted by the illegal intrusion into the attorney-client relationship. . . . The burden of such proof lies with the People. . . ." (*Id.,* at p. 759.) The prosecutor would not be allowed to rebut any defense evidence nor cross-examine any defense witness "except to impeach them with appropriate prior felony convictions, knowledge of which the People would gain from their own files, unless the People, outside the presence of the jury, first demonstrate to the satisfaction of the trial court, beyond a reasonable doubt [citation], that the evidence they seek to adduce derives in no way from the tape." (*Id.,* at p. 760.)

The court in *Wilson* did not further explain its rationale for adopting an exclusionary rule, nor did it address any of the problems inherent in such a remedy. (*Ante,* at pp. 756-759.) *Wilson* is therefore unpersuasive on this issue.

An exclusionary remedy is not only ineffective as a deterrent, but the problems of proof inherent in the remedy when applied to violations of the right to counsel would be inadequate to assure that the prosecution does not benefit from the illegality.

IV

The intrusion, through trickery, of the law enforcement agent in the confidential attorney-client conferences of petitioners cannot be con-

doned. The right to confer privately with one's attorney is "one of the fundamental rights guaranteed by the American criminal law—a right that no legislature or court can ignore or violate." (*In re Rider, supra*, 50 Cal.App. at p. 799.) The only effective remedy is the dismissal of the underlying charges. Therefore, it is ordered that a writ of prohibition be issued as prayed.

Tobriner, J., Mosk, J., and Newman, J., concurred.

**MANUEL, J.**, Concurring and Dissenting.—I agree that invasions of the defense camp, the intrusion by state agents into confidential attorney-client conferences, cannot be condoned. I disagree, however, with the conclusion of the majority that the only effective sanction is the dismissal of charges

Immunization of an accused from prosecution is an extraordinary remedy and has been reserved for the few cases where the state by its conduct has completely disabled itself in its ability to provide a fair trial. (See, for example, *In re Newbern* (1959) 175 Cal.App.2d 862 [1 Cal.Rptr. 80, 78 A.L.R.2d 901]; *Eleazer* v. *Superior Court* (1970) 1 Cal.3d 847 [83 Cal.Rptr. 586, 464 P.2d 42].) Absent jeopardy, violations of constitutional rights do not per se gain an accused immunity from punishment. (*People* v. *Valenti* (1957) 49 Cal.2d 199, 203 [316 P.2d 633]; see also *People* v. *Hitch* (1974) 12 Cal.3d 641, 653 [117 Cal.Rptr. 9, 527 P.2d 361].)[1]

The trial court here applied an exclusionary remedy, fashioned by the federal courts in cases involving breach of attorney-client confidentiality (*O'Brien* v. *United States* (1966) 386 U.S. 345 [18 L.Ed.2d 94, 87 S.Ct. 1158]; *Hoffa* v. *United States* (1966) 385 U.S. 293, 307-308 [17 L.Ed.2d 374, 384-385, 87 S.Ct. 408]; *Black* v. *United States* (1966) 385 U.S. 26, 28-29 [17 L.Ed.2d 26, 28-29, 87 S.Ct. 190]) and followed in *Wilson* v. *Superior Court* (1977) 70 Cal.App.3d 751 [139 Cal.Rptr. 61], which involved a surreptitious taping of a conversation between an accused and counsel. It may develop that the exclusionary remedy will, in a particular case, make it impossible for the prosecution to proceed. The prosecution may not be able to prove beyond a reasonable doubt, in a particular case, that the tendered evidence is not the fruit of the unlawful intrusion into

---

[1]We recognize that in some instances denial of a speedy trial cannot be remedied by other than dismissal of charges. (See *Strunk* v. *United States* (1973) 412 U.S. 434 [37 L.Ed.2d 56, 93 S.Ct. 2260]; *Jones* v. *Superior Court* (1970) 3 Cal.3d 734 [91 Cal.Rptr. 578, 478 P.2d 10], but see also *Crockett* v. *Superior Court* (1975) 14 Cal.3d 433 [121 Cal.Rptr. 457, 535 P.2d 321] and *Sykes* v. *Superior Court* (1973) 9 Cal.3d 83 [106 Cal.Rptr. 786, 507 P.2d 90].)

the defense camp. A dismissal would then be in order. Insofar as the instant case is concerned, however, resolution of that question is still in the realm of conjecture.

Here we have charges stemming from a relatively simple and unambiguous factual situation. The charged misdemeanors are trespass and failure to disperse. The acts giving rise to the criminal charges were not conducted in conspiratorial secrecy. Newspaper advertisements invited public participation in the demonstration. The planning meetings were open and public, and it was well understood that the purpose of the demonstration was to affect the use of nuclear power to generate energy. In view of their stated purpose, the demonstrators understandably conducted their protest in the glare of the media. Thirty petitioners, with twenty other protestors and accompanied by seventy-five or one hundred news media people, crossed fences and entered an access road maintained by P.G. & E. to conduct a "sit-in" near the site of the Diablo Canyon facility. The charges resulted from these activities and the failure of some of the petitioners to disperse when instructed to do so by the sheriff's deputies who were waiting for them. We must assume, then, that 100-plus eyewitnesses will be available to establish or disprove the validity of the charges in what appears to me to be a straightforward trespass case.

I condemn the subsequent conduct of Undercover Agent Lee in posing as a suspect and gaining entry to the meetings and conferences with attorneys who were retained to defend petitioners, and I agree that fundamental constitutional rights were violated by Lee's presence. The question remains, however, whether the violation of petitioners' rights, as outlined by the majority, requires that the People be barred from prosecuting the charges.

Following an extensive hearing on petitioners' motion for dismissal, the trial court expressed outrage at Lee's presence at petitioners' conferences with counsel, but was convinced that there had been no communication to the district attorney's office of any information that could be used to the benefit of the People or the detriment of petitioners. To protect petitioners' interests, however, the trial court accepted the stipulation entered into by the parties which provided for exclusion of evidence or fruits of evidence directly or indirectly attributable to the agent's presence at the conferences. The court said: "The stipulation entered into between counsel on October 28th, 1977, will be the order of the court in any further proceedings in this regard, in that the People may

not use any evidence obtained by Mr. Lee or that was derived from his presence at any meetings between counsel . . . nor the fruits thereof may not be used in evidence, and that they may not in rebuttal to any evidence put forth by the defendants, use any evidence whatsoever unless the prosecution can first prove beyond a reasonable doubt that such evidence was obtained independently of the activities of Mr. Lee. . . ."

In my view the stipulation/order is sufficient to protect the petitioners' right to a fair trial. The same remedy was proposed in *Wilson* v. *Superior Court, supra,* 70 Cal.App.3d 751, the only California case directly in point. A conversation between Wilson and his counsel had been illegally taped. The Court of Appeal held that the constitutional violation, however gross or shocking, did not justify automatic dismissal of the charges. The People were permitted to proceed to trial with the proviso that only the evidence from the preliminary hearing be used and permitting rebuttal evidence or impeachment of defense witnesses only if the People demonstrated beyond a reasonable doubt that the evidence they sought to adduce derived in no way from the tape. The court said at page 760: "In view . . . of defense counsel's testimony that the taped conversation with petitioner involved a discussion of defense strategy, we cannot permit the People to offer rebuttal to any evidence which may be introduced by the defense in petitioner's forthcoming trial, nor can the prosecutor be permitted to cross-examine defense witnesses, except to impeach them with appropriate prior felony convictions, knowledge of which the People would gain from their own files, unless the People, outside the presence of the jury, first demonstrate to the satisfaction of the trial court, beyond a reasonable doubt (*Chapman* v. *California, supra*), that the evidence they seek to adduce derives in no way from the tape. Unless the People can thus prove an independent and untainted source for their evidence, no court could be sure that the People were not aided in acquiring it by overhearing the conversation between petitioner and [counsel] unless that court further infringed petitioner's right to counsel by listening to the tape—a remedy which we cannot force upon petitioner as it would only compound the injustice which has already been perpetrated."

In a similar vein here, Agent Lee's presence at meetings involving defense strategy will preclude the People from offering any evidence or cross-examining any defense witnesses unless the People can prove an independent and untainted source for their evidence. The People's case, as noted above, will undoubtedly consist of the testimony of persons drawn from the numerous eyewitnesses. I see no problems for the People

in establishing that the evidence presented by these witnesses is independent of Agent Lee's presence at defense strategy meetings. Petitioners' defense, "political" or otherwise, will be presented by witnesses whom the People may not be able to cross-examine and against whom the People as a result of the aforementioned stipulation may not be able to present a rebuttal. But that is the People's problem. It is the People who have the burden of proving beyond a reasonable doubt that the question sought to be asked on cross-examination did not derive from Lee's presence at the defense strategy meetings, or that the rebuttal evidence sought to be presented was not similarly obtained.

Thus, I do not agree with the majority that "enforcement of the exclusionary remedy would involve exceedingly difficult problems of proof for the aggrieved client." Once it is determined that there has been an intrusion into the defense camp, the burden shifts to the prosecution to meet the difficult task of rehabilitating its evidence against the defendants. If the trial court is faced with "inability" to rule on the independent or untainted source of the People's evidence without knowing the substance of the illegal information, the trial court may simply rule that the People have not met their burden to prove an independent source beyond a reasonable doubt. The defendant cannot be compelled to reveal the information overheard by the intruding agent, for to do so "would only compound the injustice which has already been perpetrated." (*Wilson, supra,* 70 Cal.App.3d 760.)

Fortunately, the cases are few that involve breach of the confidentiality of a defendant's relationship with counsel,[2] and we therefore have little experience for assessment of the efficacy of the exclusionary remedy. The federal court experience gives us no reason to question its effectiveness.

Pretrial intervention is unwarranted. If the trial record later discloses any prejudice to petitioners, they will have recourse by appeal. I would discharge the alternative writ, deny the peremptory writ of prohibition, and permit the trial to proceed.

Richardson, J., concurred.

CLARK, J., Dissenting.—Participation of an undercover officer in attorney-client conferences was not under the circumstances of this case

---

[2] I do not believe that the instant case portends an increase in unlawful intrusions on confidential attorney-client conferences, as suggested by the majority opinion.

violative of the right to counsel protected by either the California or the federal Constitutions. But even assuming for the sake of argument that petitioners' right to counsel was violated, dismissal of the charges is wholly inappropriate—an example of judicial overkill.

The majority's attempt to distinguish *Weatherford* v. *Bursey* (1977) 429 U.S. 545 [51 L.Ed.2d 30, 97 S.Ct. 837] fails.

In that case, Weatherford, an undercover officer, joined Bursey in vandalizing a selective service office. To maintain his undercover status and his capability of working on other current matters in that capacity, Weatherford was arrested and charged along with Bursey. The two men retained separate counsel; however, on two occasions Bursey and his attorney invited Weatherford to confer with them so that they might obtain from him information, ideas or suggestions regarding Bursey's upcoming trial. Weatherford accepted these invitations but did not divulge to the prosecution any information regarding Bursey's trial plans or strategy. His identity as an undercover officer having become known shortly before trial, Weatherford was called by the prosecution and gave an eyewitness account of the crime. He did not, however, testify to anything said or done at the meetings he attended with Bursey and his attorney.

Following his conviction, Bursey sued Weatherford under 42 United States Code section 1983, alleging that Weatherford's participation in the two meetings had deprived him of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments as well as his right to a fair trial guaranteed by the due process clause of the Fourteenth Amendment. The district court found for Weatherford in all respects and entered judgment accordingly. The court of appeals, without disturbing the district court's factual findings, reversed, holding that " 'whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial.' " (429 U.S. at p. 549 [51 L.Ed.2d at p. 36].) The judgment of the court of appeals was reversed by the high court.

Because the United States Supreme Court expressly rejected the court of appeals' per se rule, it is important to recognize that the majority of this court today adopt the very rule repudiated by the high court. To reiterate, the court of appeals held that " 'whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relation-

ship the right to counsel is sufficiently endangered to require reversal and a new trial.' " (429 U.S. at p. 549 [51 L.Ed.2d at p. 36].) This court's majority here hold: "The right under California law to communicate privately with counsel was violated when a government agent in an undercover capacity was present at confidential-attorney client meetings." (*Ante,* p. 755; see also p. 752.) For both the court of appeals and the majority of this court it is immaterial that the intrusion occurred in order to maintain the officer's undercover status and his ability to work on other pending matters in that capacity, and that the prosecution was not informed of anything the officer learned at the attorney-client conferences. The position taken by the majority of this court is actually far more extreme than that taken by the court of appeals, for the federal court reversed and remanded for a new trial whereas the unprecedented remedy fashioned by this court's majority is outright dismissal of the charges.

The United States Supreme Court refused to adopt a per se rule because "it would require the informant to refuse to participate in attorney-client meetings, even though invited, and thus for all practical purposes to unmask himself. Our cases, however, have recognized the unfortunate necessity of undercover work and the value it often is to effective law enforcement. [Citations.] We have also recognized the desirability and legality of continued secrecy even after arrest. [Citation.] We have no general oversight authority with respect to state police investigations. We may disapprove an investigatory practice only if it violates the Constitution; and judged in this light, the Court of Appeals' *per se* rule cuts much too broadly. If, for example, Weatherford at Bursey's invitation had attended a meeting between Bursey and Wise [Bursey's attorney] but Wise had become suspicious and the conversation was confined to the weather or other harmless subjects, the Court of Appeals' rule, literally read, would cloud Bursey's subsequent conviction, although there had been no constitutional violation. The same would have been true if Wise had merely asked whether Weatherford was an informant, Weatherford had denied it, and the meeting had then ended; likewise if the entire conversation had consisted of Wise's questions and Weatherford's answers about Weatherford's own defense plans. Also, and more cogently for present purposes, unless Weatherford communicated the substance of the Bursey-Wise conversations and thereby created at least a realistic possibility of injury to Bursey or benefit to the State, there can be no Sixth Amendment violation. Yet under the Court of Appeals' rule Bursey's conviction would have been set aside on appeal." (429 U.S. at pp. 557-558 [51 L.Ed.2d at p. 41].)

In these hypothetical situations the rule adopted by this court today would, of course, lead to an even more absurd result—not mere reversal but dismissal of the charges.

The appropriate standard for reviewing claims of this sort can be ascertained from the high court's following statement: "Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford . . . the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case." (429 U.S. at p. 554 [51 L.Ed.2d at p. 39].) The absence of any of these elements led the high court to conclude Bursey's right to counsel had not been violated, and for the same reason there has been no violation here. Defense counsel conceded and the trial court expressly found that the prosecution has not heretofore learned anything from Officer Lee, either directly or indirectly, concerning defense tactics or strategy. Moreover, the parties stipulated that "the People may not use any evidence obtained by Mr. Lee or that was derived from his presence at any meetings between counsel, either previous counsel, present counsel or future counsel, if such be the case, nor the fruits thereof may not be used in evidence, and that they may not in rebuttal to any evidence put forth by the defendants, use any evidence whatsoever unless the prosecution can first prove beyond a reasonable doubt that such evidence was obtained independently of the activities of Mr. Lee."

The majority seek to distinguish *Weatherford* on several grounds, the first being that Weatherford retained separate counsel and attended the conferences with Bursey and his attorney at their request. (*Ante,* p. 755.) However, the significant point is that Weatherford attended the attorney-client conferences, not to spy, but to maintain his undercover status so that he might continue to work on pending matters in that capacity. (429 U.S. at p. 557 [51 L.Ed.2d at p. 41].) This case is indistinguishable in that respect. Officer Lee and his superiors all testified that he had initially undertaken this undercover investigation to determine whether petitioners planned to commit acts of violence during their demonstration against the Pacific Gas and Electric Diablo Canyon nuclear power plant or had been infiltrated by groups, e.g., the New World Liberation Front, planning violence. They further testified the officer maintained his "cover" when arrested, not to obtain information regarding petitioners' trial preparations, but to continue his investigation concerning future

demonstrations against the nuclear facility planned by petitioners. Had Officer Lee retained separate counsel he would have risked his "cover" for the other 40 demonstrators had agreed upon joint representation. He would have estranged himself from the group whose planned future demonstrations he was supposed to investigate.

Another purported distinction: "Weatherford communicated no information about the defense to his superiors. However, in the present case Officer Lee told his superiors that there was to be a 'political' defense and that the defendants would attempt to postpone the trial." (*Ante,* p. 755.)

This business of the "political defense" is a red herring. The important point is that the prosecution did not learn anything from Officer Lee, either directly or indirectly, concerning defense tactics or strategy. Petitioners' counsel so conceded, and the trial court so found. Indeed, we know nothing about the so-called "political defense" other than that Officer Lee used this perjorative term to refer to what he perceived as petitioners' delaying tactics, and that Officer Lee *may* have mentioned this matter to his immediate superior, Detective Doug Mansfield, in explaining why he (Lee) at one time felt he should disassociate himself from petitioners by entering a separate plea of nolo contendere. Detective Mansfield did not recall any such conversation. Mansfield testified, however, that he did not divulge to the prosecution anything he learned of Lee's conversations with defense counsel, and Lee testified he did not mention the matter of the "political defense" to anyone but Mansfield. Moreover, the majority's decision does not turn on this point. Had Lee said nothing to Mansfield concerning the "political defense," indeed, had Lee himself never heard of the defense, the majority would still dismiss the charges against petitioners, for Lee's mere presence at the attorney-client conferences would trigger the per se rule announced today.

Finally, the majority seek to distinguish *Weatherford* on the ground Bursey's defense was not prejudiced, while there is evidence here that since the disclosure of Officer Lee's undercover role, petitioners have become reluctant to speak out at defense meetings, fearing that there may be other undisclosed undercover agents still among them. (*Ante,* pp. 749-750, 755.) This point need not long detain us, for even petitioners' counsel labeled this alleged fear as "paranoia." Moreover, as the People point out: "It is important to note that the instant case is still in the pretrial stage, and many options are therefore available. For example; the court could order that all undercover officers must be disclosed or removed. The heads of the local police agencies could be placed under oath and

could testify that no undercover agents are being or will be used to infiltrate petitioners' meetings with counsel. If petitioners are dissatisfied with the handling of the defense they can retain or receive separate counsel to represent them individually or in smaller groups. All these and other remedies are available to cure any alleged 'fears' on the part of petitioners."

In conclusion, this case is simply not distinguishable from *Weatherford.* Applying the criteria articulated in that case reveals that petitioners' right to counsel has not been infringed. But, perhaps even more significantly, had there been a violation of the right to counsel in *Weatherford,* the high court, unlike the majority of this court, would not have invoked the remedy of outright dismissal of the charges. As the Court of Appeal recently observed in *Wilson* v. *Superior Court* (1977) 70 Cal.App.3d 751, 758 [139 Cal.Rptr. 61]: "Federal courts which have considered the issue have not required automatic dismissal of criminal charges when the confidentiality of a defendant's relationship with his attorney has been breached. Rather where the issue was raised on a post-conviction appeal it has been held that the conviction must be reversed and the cause remanded for a new trial at which the prosecution would not be permitted to make use of the illegally obtained evidence or its fruits. (*O'Brien* v. *United States,* 386 U.S. 345 [18 L.Ed.2d 94, 87 S.Ct. 1158]; *Hoffa* v. *United States,* 385 U.S. 293, 307-308 [17 L.Ed.2d 374, 384-385, 87 S.Ct. 408]; *Black* v. *United States,* 385 U.S. 26, 28-29 [17 L.Ed.2d 26, 28-29, 87 S.Ct. 190]; *Caldwell* v. *United States,* 205 F.2d 879, 881; *Coplon* v. *United States,* 191 F.2d 749, 760 [89 App.D.C. 103].)"

Their failure to distinguish *Weatherford* appears to have been recognized by the majority for they ultimately shift ground from the federal to the California Constitution, as has been their practice recently. (See, e.g., *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]; *People* v. *Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203]; *Allen* v. *Superior Court* (1976) 18 Cal.3d 520 [134 Cal.Rptr. 774, 557 P.2d 65]; *People* v. *Maher* (1976) 17 Cal.3d 196 [130 Cal.Rptr. 508, 550 P.2d 1044]; *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Longwill* (1975) 14 Cal.3d 943 [123 Cal.Rptr. 297, 538 P.2d 753]; *People* v. *Norman* (1975) 14 Cal.3d 929 [123 Cal.Rptr. 109, 538 P.2d 237]; *Gee* v. *Brown* (1975) 14 Cal.3d 571 [122 Cal.Rptr. 231, 536 P.2d 1017]; *People* v. *Brisendine* (1975) 13 Cal.3d 528 [119 Cal.Rptr. 315, 531 P.2d 1099].)

The writ should be denied.