[No. A015755. First Dist., Div. One. Jan. 29, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
WARREN D. JORDAN, JR., Defendant and Appellant.

**[Opinion certified for partial publication.‡]**

‡ Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portion to be published follows.

COUNSEL

Donald Thomas Bergerson for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

THE COURT.—An information filed in the Marin County Superior Court charged Warren D. Jordan, Jr. (hereafter appellant), with four felony counts arising from an assault on a Los Angeles Deputy District Attorney, Robert Savitt, and the Chairman of the State Board of Prison Terms, Raymond Brown, at a parole hearing on November 6, 1980. Counts I and III alleged the offense of attempted murder (Pen. Code, §§ 664 and 187), and counts II and IV alleged the offense of aggravated assault by a life

prisoner (Pen. Code, § 4500). With respect to each count, the information alleged associated enhancements that are not here at issue.

After pleading not guilty, appellant received a lengthy jury trial, punctuated by extended arguments and hearings on defense motions. The jury returned a verdict of guilty as charged on counts I and II relating to the assault on Robert Savitt, and of guilty of the lesser included offenses of attempted voluntary manslaughter (Pen. Code, § 664 and 192) and assault with a deadly weapon (Pen. Code, § 245) on counts II and IV, relating to the assault on Raymond Brown. The jury found the enhancement for use of a deadly weapon to be true with respect to counts I and III and the enhancement of great bodily injury true for counts I and II.

Upon denial of his motion for new trial, appellant was sentenced to a life term on count II, to be served consecutively to that which he is now serving, and to an upper term of four years on count IV, to be served consecutively to the sentence imposed on count II and the term he is now serving.

At the time of the offense, appellant, a Black, age 33, was serving a life sentence in the adjustment center, a high security section of San Quentin prison. On November 6, 1980, he was escorted to a parole hearing of the Board of Prison Terms after being subject to an unclothed body search. Throughout the hearing, he remained manacled with a waist chain and handcuffs. Also present at the hearing were three members of the board of prison terms, including Chairman Raymond Brown, a representative of the Los Angeles District Attorney's office, Robert Savitt, and a court reporter. At the end of the hearing, the board recessed to consider appellant's suitability for parole.

About 40 minutes later, appellant was escorted back into the hearing room and informed that the board had decided to deny his parole. He asked, "[i]s that it?" Then, as other participants rose to leave the room, he grasped a five-inch metal blade in his right hand, which suddenly appeared free of the handcuffs, and lunged at Savitt, the person sitting closest to him at the hearing. Savitt backed away and attempted to fend off the knife with his arms, receiving a stab wound in his right bicep and his left wrist. Coming to his aid, Chairman Brown rushed appellant and managed to push him to the floor though receiving himself a knife wound on the elbow.

Guards soon arrived and took appellant into custody. A short hacksaw blade and a handcuff key were later found in his mouth. The knife used in the assault was fashioned from metal taken from the bottom of a door to appellant's cell. It was never clearly established how appellant had succeeded in smuggling these items past the body search but some evidence suggest-

ed that they had been concealed in his rectum and removed when he asked permission to visit the restroom during the hearing.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .*

██ ██ Lastly, appellant argues that his Sixth Amendment right to counsel was violated by the electronic monitoring of conversations with defense counsel. The presence of electronic monitoring equipment in prison conference rooms came to light at the end of the first week of trial through an article in the San Francisco Examiner. The trial court thereupon conducted a three-day in camera hearing to determine whether the equipment had been used to monitor conversations between appellant and defense counsel, and then denied appellant's motion to dismiss the indictment.

The prison reserves five conference rooms in the visitor's center for attorney-client visits. William Nyberg, Associate Warden of Operations, testified that the previous week he had investigated monitoring equipment in the gun cage of the visiting center. The equipment consisted of a telephone and headset locked in a metal box with a line connecting to other telephones. He discovered that the telephone could overhear conversations in two of the rooms but not in two other rooms. He then cut the line and removed the telephone from the gun cage without testing whether it was also connected to the fifth room.

Appellant sought to prove that prison authorities had overheard his communications with counsel through circumstantial evidence indicating that they had an incentive to overhear the communications and pursued a pattern of scheduling his attorney conferences in the monitored rooms. With regard to incentive, a memorandum signed by former Warden Sumner stated his "strong belief that revolutionary attorneys and their investigators are supplying this man [Jordan] with escape materials and weapons. . . ." On cross-examination, the current gang coordinator expressed similar sentiments.

The evidence at the in camera hearing, together with the declaration of counsel in support of the motion for dismissal, indicated that most of appellant's conferences with counsel and investigators were scheduled in room A-2, one of the two monitored rooms.

In response, the prosecution produced 14 witnesses each of whom denied any knowledge that the monitoring equipment had ever been used to

---

*See footnote, *ante,* page 640.

overhear conversations between a prisoner and counsel. Former warden, George Sumner, testified that the monitoring equipment was installed under his direction early in 1977 to overhear visits with members of gangs and placed in the locked box a short time after installation. He first testified that, to his knowledge, it was used to monitor "three or four" conversations in 1977 and none thereafter, but later conceded on cross-examination that he "believed" it had been used to eavesdrop on visits with the Black Guerrilla family of which appellant was believed to be a member.

With regard to appellant's own visits with counsel, the prosecution presented the testimony of four guards who had manned the gun cage periodically in 1981. Three of the four denied knowing that the locked metal box contained a monitoring device, and all denied having seen the device used. On direct examination, they were asked about six dates when appellant conferred with counsel and specifically denied use of the equipment on those occasions. The prosecution did not call the guards who were on duty during counsel's visit on June 1, 1981, or during several visits between appellant and legal investigators.

After the presentation of this testimony, the trial court denied the motion to dismiss and explained, "I believe the evidence is overwhelming, really, beyond a reasonable doubt that there was no eavesdropping of the attorneys or representative of the attorneys in this case."

It is unquestionably a matter of grave concern whenever plausible charges of felonious monitoring of attorney-client communications are directed at the administration of a state prison.

Appellant proposes that we adopt a rule that, when a defendant makes a prima facie showing of eavesdropping, "prison officials should not be permitted to offer *any* rebuttal evidence." He points to the difficulty of countering self-serving testimony of prison officials and "the need to discourage planting 'bugs' in the first place." While we recognize the relevance of these considerations, appellant's rule would have the effect of treating a prima facie case as irrebuttable proof of a fact. Such a procedure would offend the basic principle that trial should be based on proof rather than speculation from an incomplete record. *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], which appellant cites, lends no support for this novel procedure. The issue there was whether the proven intrusion of a law enforcement agent into attorney-client conferences required dismissal of the underlying charges.

The trial court took the position that, once appellant made a prima facie case of eavesdropping, the burden of proof shifted to the prosecution to

prove the legality of its conduct. Although we have not found any California authority directly on point, this procedure appears reasonable. The prosecution cannot be expected to negate all possible improprieties; the burden must be on the defendant to bring forward evidence supporting the claim of a Sixth Amendment violation. But when the defendant has made a showing from which a violation may reasonably be inferred, it is consistent with the procedure followed in Fourth Amendment cases to place on the prosecution the burden of proving the legality of its conduct. (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)

The remaining question concerns the nature of the prosecution's burden of proof. The trial court evidently assumed that the prosecution was required to prove the absence of eavesdropping beyond a reasonable doubt. This standard has been applied in cases involving the prejudicial effect of proven constitutional error (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R. 3d 1065]) or the issue of guilt or innocence. (*United States* v. *Hermosillo-Nanez* (9th Cir. 1976) 545 F.2d 1230, cert. den., 429 U.S. 1050 [50 L.Ed.2d 767, 97 S.Ct. 763]; *United States* v. *Glassell* (9th Cir. 1973) 488 F.2d 143, 146, cert. den., 416 U.S. 941 [40 L.Ed.2d 292, 94 S.Ct. 1945].) But it is inappropriate for a determination of whether a constitutional right has been violated when the issue has no necessary connection to the question of guilt.

The standard of proof by a preponderance of the evidence applies at suppression hearings on alleged violations of the Fourth and Fifth Amendments. Holding that this standard applies to a determination of the voluntariness of a confession, the Supreme Court, in *Lego* v. *Twomey* (1972) 404 U.S. 477 [30 L.Ed.2d 618, 92 S.Ct. 619], reasoned that a higher burden of proof in Fourth and Fifth Amendment suppression hearings would not be sufficiently effective in deterring unlawful government conduct "to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." (*Id*. at p. 489 [30 L.Ed.2d at p.627].)

There is a precedent, however, for applying an intermediate standard— clear and convincing evidence—in cases involving alleged violation of a Sixth Amendment right. In *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], the court held that, while the conduct of a postindictment lineup without notice to the defendant's counsel violated the defendant's right to counsel, a witness to the illegal lineup was not necessarily precluded from identifying the defendant at trial. Before the witnesses' testimony is excluded, the court should give the prosecution "the opportunity to establish by clear and convincing evidence that the in-court iden-

tifications were based upon observations of the suspect other than the lineup identification." (*Id.* at p. 240 [18 L.Ed.2d at p. 1164.)

Although the factual context is quite different, the present case involves similar considerations to those in *Wade.* Both cases concern protection of the same constitutional value—the right of an accused to counsel. Both also involve a factual determination in circumstances that inevitably tend to favor the prosecution. Without having been present at a lineup, defense counsel is at a disadvantage in attacking the reliability of the lineup and demonstrating its probable influence on courtroom identification. In eavesdropping cases, the testimony of law enforcement officials may reflect a self-interest in defending the legality of their conduct. Eavesdropping is a felony under California law.[2] By denying participation in eavesdropping, prison officials may be merely shielding themselves from criminal prosecution. Since prison eavesdropping occurs in a complex bureaucratic sphere that is difficult to investigate, defense counsel cannot easily devise effective strategies for impeachment of suspect testimony, and, as the present case illustrates, faces formidable problems in proving eavesdropping by circumstantial evidence.

We conclude that the prosecution must rebut a prima facie case of eavesdropping by clear and convincing evidence. Applying this standard, the sufficiency of the evidence here presents a very close question, but we find that the record provides substantial evidence supporting the trial court's findings. Troubling though we concededly find this issue to be, as a court of review, we nevertheless cannot impose on the trial court our own assessment of the credibility of witnesses.

The judgment is affirmed.

A petition for a rehearing was denied February 27, 1990, and appellant's petition for review by the Supreme Court was denied April 26, 1990.

---

[2] Penal Code section 636 provides in part: "Every person, who, without permission from all parties to the conversation, eavesdrops on . . . a conversation . . . between a person who is in the physical custody of a law enforcement officer or other public officer . . . and such person's attorney . . . is guilty of a felony; . . ."