State of Nebraska, appellee, v.
Corey A. Brooks, appellant.
___ N.W.2d ___

Filed October 14, 2014.    No. A-13-761.

1. **Constitutional Law: Miranda Rights: Self-Incrimination.** In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court sought to protect the Fifth Amendment privilege against compelled self-incrimination from the inherently compelling pressures of custodial interrogation. To do so, the Court required law enforcement to give a particular set of warnings to a person in custody before interrogation: that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to an attorney, either retained or appointed.

2. **Miranda Rights: Self-Incrimination.** While the particular rights delineated under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are absolute, the language used to apprise suspects of those rights is not.

3. ____: ____. The inquiry in reviewing *Miranda* warnings is simply whether the warnings reasonably convey to a suspect his rights.

4. **Constitutional Law: Right to Counsel.** Once the adversary process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings.

5. **Constitutional Law: Right to Counsel: Waiver.** The Sixth Amendment right to counsel may be waived by a defendant, so long as the relinquishment of the right is voluntary, knowing, and intelligent.

6. **Constitutional Law: Miranda Rights: Right to Counsel: Waiver.** When a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically "does the trick" with regard to the requirement that such waiver be voluntary, knowing, and intelligent, even though the *Miranda* rights purportedly have their source in the Fifth Amendment.

7. ____: ____: ____: ____. As a general matter, an accused who is admonished with the warnings prescribed in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.

8. **Right to Counsel.** Once an accused has invoked his right to counsel, he is not subject to further interrogation by the authorities until counsel has been made available, unless he initiates the contact.

9. **Constitutional Law: Right to Counsel: Attorney and Client.** Inherent in the Sixth Amendment right to counsel is the assurance of confidentiality and privacy of communication with counsel.

10. **Right to Counsel.** The right to counsel is violated when a state agent is present at confidential attorney-client conferences.

11. **Criminal Law: Trial: Evidence.** Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian;

and if one link in the chain is missing, the object may not be introduced in evidence.

12. **Trial: Evidence.** In determining whether the State has established a sufficient chain of custody, a court decides the issue on a case-by-case basis, considering the following factors: the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object.

13. ____: ____. Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue.

14. ____: ____. It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading. As long as the article can be identified, it is immaterial in how many or in whose hands it has been.

15. **Trial: Evidence: Proof.** Proof that an exhibit remained in the custody of law enforcement officials is sufficient to prove a chain of possession and is sufficient foundation to permit its introduction into evidence.

16. **Trial: Evidence: Appeal and Error.** Appellate review concerning the admissibility of evidence is for an abuse of discretion.

17. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

18. **Effectiveness of Counsel: Records: Appeal and Error.** On direct appeal, the resolution of ineffective assistance of counsel claims turns upon the sufficiency of the record.

19. ____: ____: ____. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

20. **Criminal Law: Effectiveness of Counsel: Records: Appeal and Error.** The trial record reviewed on appeal in a criminal case is devoted to issues of guilt and innocence and does not usually address issues of counsel's performance.

21. **Effectiveness of Counsel: Appeal and Error.** A defendant alleging that trial counsel was ineffective is required to specifically assign and argue his trial counsel's allegedly deficient conduct.

22. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** On direct appeal, an appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.

23. **Effectiveness of Counsel: Appeal and Error.** Specific allegations of prejudice are not required when the issue of counsel's performance is raised on direct appeal.

Appeal from the District Court for Douglas County: JOSEPH S. TROIA, Judge. Affirmed.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Inbody, Chief Judge, and Irwin and Bishop, Judges.

Irwin, Judge.

## I. INTRODUCTION

Corey A. Brooks appeals his convictions for possession of a deadly weapon by a prohibited person and possession with intent to deliver methamphetamine. On appeal, Brooks challenges the denial of motions to suppress and alleges his various trial attorneys provided ineffective assistance of counsel. We find that Brooks' assertions regarding counsel cannot be resolved on the record provided, and we otherwise find no merit to Brooks' assertions on appeal. We affirm.

## II. BACKGROUND

This case is closely related to and interwoven with *State v. Brooks*, *ante* p. 419, ___ N.W.2d ___ (2014). The charges in the instant case arose largely out of evidence seized upon Brooks' arrest upon the execution of an arrest warrant issued related to the charges in *State v. Brooks*. Because of the interwoven nature of the evidence and procedural posture of the two cases, we take judicial notice of the appellate record presented in *State v. Brooks*. See *Dowd Grain Co. v. County of Sarpy*, 19 Neb. App. 550, 810 N.W.2d 182 (2012) (appellate court may examine and take judicial notice of proceedings and judgment of interwoven cases). See, also, *Pennfield Oil Co. v. Winstrom*, 276 Neb. 123, 752 N.W.2d 588 (2008) (appellate court may take judicial notice of documents filed in separate but related action).

As set forth in the opinion in *State v. Brooks, supra*, Brooks was implicated in the homicide of James Asmus that occurred in September 2011. The investigation into that homicide eventually led Omaha Police Department (OPD) officers to obtain and execute an arrest warrant to take Brooks into custody.

OPD officers executed the arrest warrant on September 10, 2011. After conducting surveillance on a location at which they believed Brooks to be located, officers identified Brooks getting into a vehicle. As officers approached, Brooks ran. Numerous officers gave chase and eventually apprehended Brooks. A search of Brooks' person and the area through which he had run resulted in the location of drugs, cash, and a gun.

On September 11, 2011, after being arrested and booked, Brooks indicated to corrections officers that he wished to speak to OPD officers. Brooks was transported to an OPD interview room. Brooks' attorney, Bill Eustice, had previously contacted OPD Sgt. Donald Ficenec during OPD's investigation into the homicide of Asmus and had indicated that Brooks "wanted to come make a statement to the Omaha police," but Eustice was at that time out of town and wanted to arrange a time for Brooks to make a statement. Prior to arrangements' being made and Brooks' making a statement, however, OPD officers obtained and executed the arrest warrant. In light of Eustice's prior contact, Ficenec called Eustice and allowed Brooks to speak with Eustice on the telephone, privately, prior to any OPD interview of Brooks. After Brooks finished speaking with Eustice, Brooks gave the telephone to Ficenec and Eustice indicated to Ficenec that "Brooks had indicated to [Eustice] that he was going to tell [OPD officers] the same information that . . . Brooks had already told . . . Eustice." After Brooks spoke with Eustice, he was advised of his *Miranda* rights and was interviewed by another OPD officer.

During the course of the interview, Brooks made statements about the drugs found on his person "two to three" times. When Ficenec made a statement about OPD's having "located four and a half grams" of drugs, Brooks "corrected him and said ounces." Brooks also stated during the interview, "I got caught with the drugs, I did get caught with the gun, that's mine." Finally, Brooks also made a statement about the cash found on his person; Ficenec made a statement indicating that approximately $2,500 had been located, and Brooks indicated that "it should be closer to [$]4,000."

Brooks also spoke with OPD officers in interviews that occurred on October 30 and December 22, 2011. Both times, in events comparable to the September 11 interview, Brooks requested to speak with OPD officers despite having counsel. Ficenec indicated that Brooks contacted him approximately 13 times between late October and December 2011.

In February 2012, Eustice was allowed to withdraw from representing Brooks. Another attorney entered an appearance on behalf of Brooks. In July, this second attorney was allowed to withdraw from representing Brooks. A third attorney was appointed to represent Brooks. Additionally, another attorney appeared as cocounsel with the third attorney on behalf of Brooks.

In July 2012, during the second attorney's argument to the court concerning his request to withdraw from representation of Brooks, he indicated that he had given Brooks a copy of police reports concerning the investigation into Brooks' case. Brooks' personal possession of police reports while incarcerated was contrary to a "Receipt of Discovery" agreement that had been signed on behalf of Eustice, during his representation of Brooks, and signed by the second attorney during his representation of Brooks. The State alleged that Brooks' personal possession of police reports violated "office policies and create[d] a risk of witness interference, harassment and tampering." As a result, the State contacted the Douglas County Department of Corrections and asked that all police reports be confiscated from Brooks' possession. The confiscated materials were then sealed and eventually turned over to the State.

The State then attempted to have Brooks' then-counsel, the aforementioned third attorney, review the materials and remove any work product. The sealed materials were opened, and the attorney was requested to take possession of the materials and remove any work product; he refused to take possession of the materials. The materials were then locked in an evidence room.

In July 2012, Brooks filed a second amended motion to suppress, in which he sought to suppress, "from use against [Brooks], any and all evidence contained in the police reports

associated with" the instant case. Brooks alleged that a variety of his constitutional rights had been violated by the confiscation of police reports from his cell. In August, the State filed a motion seeking to have Brooks compelled to review the confiscated material and remove any work product.

At a hearing on Brooks' motion to suppress evidence contained in the police reports, Brooks testified at length about the police reports that had been confiscated from his possession. He testified that he had previously reviewed the police reports with his counsel, that together they had made notes and underlined information on the police reports, and that the reports had his "writing, underlining and notes written on almost every page." When Brooks was shown the reports confiscated from his possession, he testified that a number of pages appeared to be missing.

The two exhibits that compose the reports confiscated from Brooks' possession are together more than 500 pages in length. Although the testimony before the trial court reflected that the reports were contained in a variety of "envelopes" and were testified to in conjunction with references to the reports in each of approximately nine envelopes, the exhibits presented to this court on appeal do not contain those envelopes and, instead, include simply a series of police reports with a blank blue sheet inserted occasionally between them, throughout; our review suggests that the blue sheets and the contents between them do not correspond to any particular envelopes or to any indication of the specific reports within a particular envelope as testified to before the trial court. A review of the police reports presented to this court indicates that few of the more than 500 pages include any kind of markings, and the markings that do appear generally consist of either underlining of small portions of a report or a handwritten reference, at the top of a page, to the name of the particular witness that the report concerns.

At the conclusion of the hearing on Brooks' motion to suppress, the trial court expressed confusion about what Brooks was seeking to suppress. When the court specifically asked Brooks' counsel what he was seeking to suppress, counsel indicated, "the evidence that is contained in the police reports."

The court indicated that it was not going to suppress all of the evidence contained in police reports on the basis of copies of the reports' being confiscated from Brooks. The court ultimately granted the State's motion to compel and denied Brooks' motion to suppress.

In December 2012, Brooks filed a third amended motion to suppress, seeking to exclude from evidence the drugs, the cash, and the gun located at the time of his arrest. In support of the motion, Brooks asserted that OPD reports related to the evidence listed "recovery date[s]" that were inconsistent with his September 11, 2011, arrest. Brooks asserted that problems with the chain of custody required exclusion of the evidence.

This case was tried before a jury in July 2013. The jury returned verdicts of guilty on the charges of possession with intent to deliver methamphetamine and possession of a deadly weapon by a prohibited person. The trial court entered judgment, Brooks was sentenced, and this appeal followed.

### III. ASSIGNMENTS OF ERROR

In this appeal, Brooks has assigned four errors. First, Brooks asserts that "[t]he trial court erred in failing to suppress the evidence obtained during Brooks' September 11, 2011 interview." Second, Brooks asserts that his case should be dismissed as a result of the State's confiscation of the police reports that had been in his possession; alternatively, he asserts that he should be granted a new trial. Third, Brooks asserts that "[t]he trial court erred when it admitted gun and drug evidence despite the State's failure to adequately demonstrate that the evidence remained in the custody of law enforcement . . ." prior to trial. Fourth, Brooks asserts that his "respective trial counsels [sic] provided prejudicial ineffective assistance."

### IV. ANALYSIS

#### 1. September 11, 2011, Interview

Brooks first assigns as error that the district court erred "in failing to suppress the evidence obtained during Brooks' September 11, 2011 interview." The record demonstrates that

Brooks was advised of his rights, was afforded the opportunity to speak with his counsel, initiated contact with law enforcement, and voluntarily waived his right to counsel. This assigned error is without merit.

[1-3] In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court sought to protect the Fifth Amendment privilege against compelled self-incrimination from the inherently compelling pressures of custodial interrogation. *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012). To do so, the Court required law enforcement to give a particular set of warnings to a person in custody before interrogation: that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to an attorney, either retained or appointed. *Id*. While the particular rights delineated under *Miranda* are absolute, the language used to apprise suspects of those rights is not. *State v. Nave, supra*. The inquiry is simply whether the warnings reasonably convey to a suspect his rights. *Id*.

[4-7] The U.S. Supreme Court has noted that once the adversary process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *Montejo v. Louisiana*, 556 U.S. 778, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009). Interrogation by the State is such a stage. *Id*. The Sixth Amendment right to counsel may be waived by a defendant, so long as the relinquishment of the right is voluntary, knowing, and intelligent. *Montejo v. Louisiana, supra*. When a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically "does the trick," even though the *Miranda* rights purportedly have their source in the Fifth Amendment. *Montejo v. Louisiana*, 556 U.S. at 786. As a general matter, an accused who is admonished with the warnings prescribed in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one. *Montejo v. Louisiana, supra*, quoting *Patterson*

*v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988).

In this case, Brooks was read his rights verbatim from the OPD's rights advisory form, *after* he had already been afforded the opportunity to speak to his counsel. Brooks indicated that he understood his rights and proceeded to speak with officers. The warnings were reasonably conveyed to Brooks, he actually spoke with counsel, and he waived his rights.

[8] In *Montejo v. Louisiana, supra*, the Court recognized that once an accused has invoked his right to counsel, he is not subject to further interrogation by the authorities until counsel has been made available, *unless he initiates the contact*. See, also, *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Brooks points to *Edwards* as support for his argument that he had invoked his right to counsel and that the right was infringed by the September 11, 2011, interrogation. We disagree.

The record in this case is clear. Brooks initiated the contact with law enforcement before each interview, including the September 11, 2011, interview. Indeed, at the time of the September 11 interview, Brooks requested to speak to law enforcement and law enforcement contacted Brooks' counsel and had Brooks speak with his counsel. Brooks indicated a desire to speak with law enforcement after speaking with his counsel and affirmatively waived his rights.

Brooks argues on appeal that evidence should have been suppressed because his waiver was limited to an authorization "to elicit a specific statement regarding the homicide" and that the specific statement was an exculpatory statement. Brief for appellant at 14. Specifically, Brooks argues in his brief that law enforcement "accepted Brooks' subsequent waiver of his [*Miranda*] rights after [counsel] advised both Brooks and [law enforcement] that police were authorized to elicit a specific statement regarding the homicide charged [in *State v. Brooks, ante* p. 419, ___ N.W.2d ___ (2014)]." Brief for appellant at 14. The record does not support this assertion.

The portion of the record cited by Brooks in support of the above assertion does not include any such testimony. Rather, the record indicates that Ficenec spoke with Brooks' counsel,

Eustice; that Eustice did not communicate any issues or problems with an interview of Brooks; and that Eustice indicated that Brooks "was going to tell [law enforcement] the same information that [he] had already told" Eustice. Ficenic testified that Eustice did not put any parameters on the interview that was to take place and did not indicate that anything was "off limits." Eustice also testified, but he did not testify that he put any restrictions or limitations on the interview of Brooks.

In his brief on appeal, Brooks asserts that "Ficenec knew that Eustice did not have any information concerning the new gun and drug offenses that the State eventually filed in the case" and that "Eustice advised both Brooks and Ficenec that police were authorized to elicit a specific statement regarding the homicide" at issue in *State v. Brooks, supra*. Brief for appellant at 14. Our review of the portions of the record cited by Brooks, however, indicates that the cited portions of the record do not include any such testimony. Rather, the cited portions of the record indicate that Ficenec testified that Eustice did not communicate any issues or problems with interviewing Brooks and that Eustice told Ficenec that Brooks "was going to tell [law enforcement] the same information that [he] had already told" Eustice.

There is no indication in our record of what, precisely, Brooks had previously told Eustice. There is, obviously, no indication in our record of what Brooks and Eustice discussed or whether Brooks had informed Eustice of anything related to the charges in the instant case. It does not appear that Eustice was ever actually asked if he had been aware of anything related to the charges in the instant case.

Eustice was asked if, during his telephone conversation with Brooks on September 11, 2011, any information was given to him "about [Brooks'] actually being in the homicide interrogation room and being under arrest for murder," and Eustice indicated that although "[n]othing specifically" had been said, he "just assumed that [Brooks] was" because Ficenec had initiated the telephone call. Eustice also testified that his "reasoning behind suggesting that . . . Brooks talk

to [officers] is because [Brooks'] version of what occurred was exculpatory."

Brooks repeatedly asserts throughout his argument that OPD officers violated his rights and did not effectively make counsel available because they "knowingly exceeded the scope of the authorization granted . . . by Eustice when [they] questioned Brooks regarding the gun and drug offenses the State eventually charged in the case at bar." Brief for appellant at 14. Brooks argues that officers "failed to recognize or failed to honor the limitations placed on the interview by Eustice" and that the information Eustice authorized officers to get from Brooks "consisted of a specific exculpatory statement concerning only the homicide." *Id*. at 17. The record presented by Brooks, however, does not support this suggestion.

Finally, we note that although the interviews of Brooks were recorded, sometimes with both audio and visual recording and sometimes with only audio recording, the actual recordings of the interviews were not offered as evidence to the jury. Rather, the State offered exhibits which comprised two of the interviews and a "redacted" version of the interviews "for limited purpose for the Court and the record." Evidence was adduced in the form of testimony of Ficenec and another officer concerning the interviews and statements that Brooks had made, but it is not apparent that any recording of the interviews was ever played for the jury.

In this case, Brooks initiated contact with law enforcement, was afforded the opportunity to speak with his counsel, was advised of all of his rights, and voluntarily waived those rights. The district court did not err in overruling the motion to suppress.

## 2. Confiscation of Police Reports

Brooks next assigns as error that the charges brought against him "should be dismissed because the State violated Brooks' constitutional right to private communications with counsel when it raided Brooks' cell without his knowledge

and confiscated his confidential work product." In the alternative, Brooks seeks to have the convictions reversed and the matter remanded for a new trial. This assigned error is meritless.

As noted above in the background section, during the course of these proceedings, one of Brooks' attorneys provided him with copies of police reports, in violation of Douglas County policies and discovery agreements signed by Brooks' counsel. The State then had law enforcement confiscate the materials and took steps to have Brooks' counsel review the materials and remove any work product. The evidence adduced at trial uniformly indicated that the State never looked at any of the materials and was not aware of whether any work product appeared on any of the materials.

Brooks argues that the privacy of his communications with his counsel was violated because the confiscated materials included "work produced by Brooks both by himself and while working on his case with trial counsel." Brief for appellant at 21. Brooks urges us to reach a conclusion similar to that of the California Supreme Court in *Barber v. Municipal Court, etc.*, 24 Cal. 3d 742, 598 P.2d 818, 157 Cal. Rptr. 658 (1979). We decline to do so.

In *Barber v. Municipal Court, etc.*, participants of a "sit-in" near a nuclear power facility as a demonstration of opposition to the use of nuclear power were charged with trespassing and unlawful assembly. As it turned out, one of the codefendants was actually an undercover police officer, who had become intimately involved with the group and attended numerous planning meetings. After the participants were arrested, attorneys arrived at the jail and conducted a confidential attorney-client conference with the arrestees, including the undercover officer. The undercover officer was present for the confidential attorney-client conference with the defendants and testified that he was sure defense strategy had been discussed, but that he had not paid close attention.

At or around the time of the defendants' arraignment, the presiding judge and the prosecuting attorney were informed that one of the defendants was an undercover officer, but

defense counsel was not informed. The undercover officer continued to pose as a codefendant with the defendants and as a client of defense counsel. He attended numerous confidential attorney-client conferences that included detailed discussions about the case and defense strategy. He participated in discussion about the defense.

Throughout the pretrial proceedings, the undercover officer reported to his superiors. His superiors testified that they could not remember what information he had conveyed to them, but that they were sure he had given them no information about defense strategy.

At some point, approximately 2 months after the arrests, the undercover officer's identity as an undercover officer was made known to defense counsel and to the defendants. Evidence indicated that after this information was revealed, the defendants became paranoid, distrustful of one another and their counsel, and reluctant to actively participate in preparing a defense.

The defendants filed a motion seeking to have the charges dismissed. The trial court denied the motion on the ground that there was no evidence any confidential information had been transmitted to the prosecution, but ordered suppression of any evidence gained from the undercover officer or derived from his presence at any meetings between the defendants and their counsel.

[9,10] On appeal, the California Supreme Court reversed. *Id*. The court recognized that inherent in the Sixth Amendment right to counsel is the assurance of confidentiality and privacy of communication with counsel. Thus, the court held that the right to counsel is violated "when a state agent is present at confidential attorney-client conferences." *Barber v. Municipal Court, etc*., 24 Cal. App. 3d at 752, 598 P.2d at 823, 157 Cal. Rptr. at 663.

The California Supreme Court, relying heavily on the evidence of the impact on the relationship between the defendants and their counsel of discovering the undercover officer's true identity, concluded that on the facts of that case, dismissal was the only appropriate remedy. *Id*.

The present case, however, is substantially distinguishable. This case does not involve any situation where any representative of the State was "sitting in on" any conversations between Brooks and counsel. The present case does not present a situation where any member of the prosecution or the investigating officers was privy to any discussions between Brooks and his counsel or aware of any aspects of defense strategy. The unrefuted evidence in this case is that once the materials were confiscated, nobody associated with the State actually read or reviewed any of the contents of the materials.

In this case, Brooks did not move for dismissal at the trial level. Rather, he moved "that any evidence contained in the police reports, . . . containing [Brooks'] protected defense work product, be excluded from use against him at trial." Although it was not entirely clear what relief Brooks was seeking at trial and the trial court expressed confusion about the relief being sought, there was no request for dismissal of any charges. Brooks has not assigned as error the district court's denial of the relief he actually requested at trial, suppression.

We are thus left with a situation where Brooks requested a particular relief at trial, was denied that relief, and has not assigned error to the denial of that relief, but where he asserts on appeal that the district court erred in not granting other relief that was never requested. The only way this assigned error could be found to have merit would be on the basis of a finding of plain error.

To the extent Brooks appears to have requested the trial court to suppress the entire contents of all police reports in this case because copies of them were confiscated from his cell—confiscated on the basis that his possession thereof violated Douglas County policies and disclosure agreements signed by his counsel—we find no plain error in the district court's denial of the motion.

To the extent Brooks seeks to have us grant relief never requested below, either in the form of dismissal of all charges or in the form of a new trial, we similarly find no plain error meriting such relief. The record in this case is clear that

the State did not look at any of the confiscated materials to determine any content therein, contrary to the undercover officer's continued participation and awareness of specific defense strategies in *Barber v. Municipal Court, etc*., 24 Cal. 3d 742, 598 P.2d 818, 157 Cal. Rptr. 658 (1979). Moreover, although the confiscated materials are presented as exhibits that together appear to be at least 500 pages in length, our review of the materials indicates that there is little to no information contained therein that was added to the original reports by Brooks or his counsel. Indeed, the most that can be said about the confiscated reports appears to be that someone underlined some portions of witness testimony on a handful of the police reports and wrote the name of particular witnesses who are mentioned in the reports at the top of a handful of pages. The vast majority of the 500 or more pages contain absolutely no markings whatsoever.

The denial of the relief requested at trial has not been appealed to us. The relief urged on appeal was not requested at trial. We find no plain error and find this assigned error to be meritless.

### 3. Chain of Custody

Brooks next assigns as error that the district court erred "when it admitted gun and drug evidence despite the State's failure to adequately demonstrate that the evidence remained in the custody of law enforcement for the entire period prior to trial." Brooks' argument in this regard is primarily focused on the fact that "[w]ritten forms relating to both the gun and the drugs introduced during Brooks' trial contained dates of recovery that did not match the dates of recovery testified to by the officers." Brief for appellant at 28. We find no merit to this assigned error.

[11,12] Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence. *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011); *State*

*v. Veatch*, 16 Neb. App. 50, 740 N.W.2d 817 (2007). In determining whether the State has established a sufficient chain of custody, a court decides the issue on a case-by-case basis, considering the following factors: the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object. *State v. Kofoed*, 283 Neb. 767, 817 N.W.2d 225 (2012). See, also, *State v. Glazebrook, supra*.

[13-16] Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue. *State v. Glazebrook, supra*; *State v. Veatch, supra*. It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading. *Id*. As long as the article can be identified, it is immaterial in how many or in whose hands it has been. *State v. Veatch, supra*. Proof that an exhibit remained in the custody of law enforcement officials is sufficient to prove a chain of possession and is sufficient foundation to permit its introduction into evidence. *Id*. Appellate review concerning the admissibility of evidence is for an abuse of discretion. See *id*.

In this case, Brooks first filed a motion to suppress the drugs found on his person at the time of his arrest and the gun found at the time of his arrest, arguing that there was a problem with the chain of custody because OPD forms concerning the evidence included a "recovery date" that was not consistent with the date of his arrest. At the hearing on Brooks' motion, the OPD employees responsible for completing the forms testified that it appeared that a mistake had been made concerning the recovery date. The State argued that a motion to suppress was not the proper way to challenge the chain of custody, because the State could prove the chain of custody through testimony at trial. See, e.g., *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990) (assertion concerning chain of custody goes to weight to be given to evidence presented rather than to admissibility of evidence). The trial court agreed and held that the testimony concerning clerical error was sufficient to support denial of the motion to suppress.

At trial, the State adduced additional evidence concerning the chain of custody for the drugs and the gun. Officer Robert Laney testified that he counted the money and put the money and drugs that were found on Brooks' person into evidence. An OPD crime laboratory technician testified that she received the drugs from Laney and made sure that the packaging all matched up with the actual contents and that the paperwork was properly completed to check the drugs in as evidence. An employee in OPD's property and evidence unit testified that the crime laboratory technician booked the drugs into a locker and that he then took the drugs from the locker to the property room and documented everything in the crime laboratory book.

Laney testified about the process of putting items into evidence and testified that another employee was responsible for then filling out the form identifying the drugs and allowing for tracking of the drugs while they remained in the custody of law enforcement and for checking them out for testing. That employee testified that she filled out the form and that she put the wrong date on the form as the date of recovery. A forensic chemist testified that he checked out the drugs for testing, that he personally picked the drugs up from OPD, and that the drugs were in his possession while checked out. He testified that another employee returned the drugs to OPD. Another employee of the property and evidence unit testified that he checked the drugs back in when the forensic chemist returned them after testing.

With respect to the gun, an OPD crime laboratory technician testified that she went to the scene of Brooks' arrest on September 11, 2011, marked items of evidence for photographing, collected items of evidence, and transported evidence back to OPD's crime laboratory. She testified that the gun and ammunition located at the time of Brooks' arrest were placed into a safe and that she made the necessary notations in the property book. An employee of the property and evidence unit testified that the crime laboratory technician checked the gun into a property locker and that the employee then retrieved the gun from the locker and placed it into an OPD evidence storage location.

The evidence adduced at trial demonstrated that the drugs and the gun were in the possession of OPD from the time they were located at Brooks' arrest until trial. The evidence demonstrated that logbooks and records were kept to document each person who took possession of the items throughout the time leading up to trial. The evidence indicated that a clerical error was made with regard to the date of recovery on two of the chain of custody forms, but there was no evidence adduced to suggest that the items were ever out of law enforcement's control, tampered with by any intermeddlers, or subject to any substantial change so as to render them misleading. See *State v. Veatch*, 16 Neb. App. 50, 740 N.W.2d 817 (2007). We find no abuse of discretion in the district court's allowing admission of the evidence at trial. This assigned error is without merit.

### 4. Assistance of Counsel

Finally, Brooks assigns as error that his "respective trial counsels [sic] provided prejudicial ineffective assistance." He argues that "all of his trial counsels [sic]" provided ineffective assistance "at various points throughout the proceedings." Brief for appellant at 32. Brooks asserts that his trial attorneys were ineffective in a variety of ways, including failing to interview, depose, or subpoena a variety of witnesses, and that Eustice was ineffective in advising Brooks to speak with police without his presence on several occasions. We find that these assertions cannot properly be considered in this direct appeal.

[17] The test for ineffective assistance of counsel is well settled. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[18-20] On direct appeal, the resolution of ineffective assistance of counsel claims turns upon the sufficiency of the record. *Id*. The fact that an ineffective assistance of counsel claim is

raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. *Id*. This is because the trial record reviewed on appeal in a criminal case is devoted to issues of guilt and innocence and does not usually address issues of counsel's performance. *Id*.

[21-23] A defendant alleging that trial counsel was ineffective is required to specifically assign and argue his trial counsel's allegedly deficient conduct. *Id*. On direct appeal, an appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance. *Id*. Specific allegations of prejudice, however, are not required when the issue is raised on direct appeal. *Id*.

In this case, the record presented on direct appeal is not sufficient for us to resolve Brooks' assertions that his trial counsel performed ineffectively. Although Brooks asserts that counsel performed ineffectively in failing to independently interview, depose, or subpoena a variety of witnesses, there is no record presented to us to demonstrate that counsel actually did fail to interview or depose any of the witnesses. Although Brooks makes assertions in his brief about what the various witnesses would have testified, there is obviously no record to support his assertions or to indicate what any of the witnesses might have testified.

Finally, although the record does indicate that Eustice advised Brooks to speak with law enforcement without his presence, the record has not been developed to fully indicate Eustice's motivations for such a decision, beyond his expectation that Brooks would provide an exculpatory statement. Moreover, it is not apparent from the record presented how Eustice's advice in this regard resulted in prejudice, inasmuch as there was substantial evidence adduced to the trial court concerning Brooks' involvement in the homicide.

On the record presented on direct appeal, we cannot find that Brooks' trial counsel performed deficiently or that any alleged deficient performance prejudiced Brooks' defense.

At this time, the record is insufficient to further address the merits of Brooks' assertions about the effectiveness of his counsel.

## V. CONCLUSION

We find no merit to Brooks' assertions on appeal. We affirm.

AFFIRMED.

――――――――――――

State of Nebraska, appellee, v.
John P. Tharp, appellant.
___ N.W.2d ___

Filed October 14, 2014.    No. A-13-959.

1. **Criminal Law: Trial: Pretrial Procedure: Motions to Suppress: Appeal and Error.** In a criminal trial, after a pretrial hearing and order denying a motion to suppress, the defendant must object at trial to the admission of evidence sought to be suppressed to preserve an appellate question concerning the admissibility of that evidence.
2. **Trial: Evidence: Motions to Suppress: Waiver: Appeal and Error.** A failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and that party will not be heard to complain of the alleged error on appeal.
3. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.
4. ____: ____. An appellate court gives statutory language its plain and ordinary meaning.
5. **Statutes: Legislature: Intent.** In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.
6. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

Appeal from the District Court for Scotts Bluff County: Randall L. Lippstreu, Judge. Affirmed.