## CONCLUSION

Pursuant to the Department's rules, the time to file a petition for redetermination cannot be extended. We find that this rule is controlling and that as a result, the district court properly affirmed the decision of the Department that Lyman-Richey's petition for redetermination was not timely filed with the Department. An appellate court will affirm a lower court's ruling that reaches the correct result, although based on different reasoning. *Feloney v. Baye*, 283 Neb. 972, 815 N.W.2d 160 (2012). Thus, the decision of the district court is affirmed.

Affirmed.

—————————————

State of Nebraska, appellee, v.
Corey A. Brooks, appellant.
___ N.W.2d ___

Filed October 14, 2014.    No. A-13-760.

1. **Constitutional Law: Miranda Rights: Self-Incrimination.** In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court sought to protect the Fifth Amendment privilege against compelled self-incrimination from the inherently compelling pressures of custodial interrogation. To do so, the Court required law enforcement to give a particular set of warnings to a person in custody before interrogation: that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to an attorney, either retained or appointed.

2. **Miranda Rights: Self-Incrimination.** While the particular rights delineated under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are absolute, the language used to apprise suspects of those rights is not.

3. ____: ____. The inquiry in reviewing *Miranda* warnings is simply whether the warnings reasonably convey to a suspect his rights.

4. **Constitutional Law: Right to Counsel.** Once the adversary process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings.

5. **Constitutional Law: Right to Counsel: Waiver.** The Sixth Amendment right to counsel may be waived by a defendant, so long as the relinquishment of the right is voluntary, knowing, and intelligent.

6. **Constitutional Law: Miranda Rights: Right to Counsel: Waiver.** When a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically "does the trick" with regard to the requirement that such waiver be voluntary,

knowing, and intelligent, even though the *Miranda* rights purportedly have their source in the Fifth Amendment.

7. ____: ____: ____: ____. As a general matter, an accused who is admonished with the warnings prescribed in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.

8. **Right to Counsel.** Once an accused has invoked his right to counsel, he is not subject to further interrogation by the authorities until counsel has been made available, unless he initiates the contact.

9. **Constitutional Law: Right to Counsel: Attorney and Client.** Inherent in the Sixth Amendment right to counsel is the assurance of confidentiality and privacy of communication with counsel.

10. **Right to Counsel.** The right to counsel is violated when a state agent is present at confidential attorney-client conferences.

11. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

12. **Effectiveness of Counsel: Records: Appeal and Error.** On direct appeal, the resolution of ineffective assistance of counsel claims turns upon the sufficiency of the record.

13. ____: ____: ____. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

14. **Criminal Law: Effectiveness of Counsel: Records: Appeal and Error.** The trial record reviewed on appeal in a criminal case is devoted to issues of guilt and innocence and does not usually address issues of counsel's performance.

15. **Effectiveness of Counsel: Appeal and Error.** A defendant alleging that trial counsel was ineffective is required to specifically assign and argue his trial counsel's allegedly deficient conduct.

16. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** On direct appeal, an appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.

17. **Effectiveness of Counsel: Appeal and Error.** Specific allegations of prejudice are not required when the issue of counsel's performance is raised on direct appeal.

Appeal from the District Court for Douglas County: Joseph S. Troia, Judge. Affirmed.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

INBODY, Chief Judge, and IRWIN and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Corey A. Brooks appeals his convictions for manslaughter, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. On appeal, Brooks challenges the denial of motions to suppress and alleges his various trial attorneys provided ineffective assistance of counsel. We find that Brooks' assertions regarding counsel cannot be resolved on the record provided, and we otherwise find no merit to Brooks' assertions on appeal. We affirm.

## II. BACKGROUND

This case is closely related to and interwoven with *State v. Brooks, post* p. 435, ___ N.W.2d ___ (2014). The charges in that case arose largely out of evidence seized upon Brooks' arrest upon the execution of an arrest warrant issued related to the charges in the instant case. Because of the interwoven nature of the evidence and procedural posture of the two cases, we take judicial notice of the appellate record presented in *State v. Brooks*. See *Dowd Grain Co. v. County of Sarpy*, 19 Neb. App. 550, 810 N.W.2d 182 (2012) (appellate court may examine and take judicial notice of proceedings and judgment of interwoven cases). See, also, *Pennfield Oil Co. v. Winstrom*, 276 Neb. 123, 752 N.W.2d 588 (2008) (appellate court may take judicial notice of documents filed in separate but related action).

The events giving rise to this case occurred during the evening hours of September 2, 2011. On that date, Omaha Police Department (OPD) officers answered a radio call of a shooting and found the victim, James Asmus, deceased, in a detached garage. Officers observed a gunshot wound to Asmus' head. Asmus had also been shot in the leg.

OPD officers investigated Asmus' death and conducted numerous interviews with several witnesses and suspects, executed search warrants, and investigated telephone records. As

a result of that investigation, officers determined that Brooks and a number of other individuals had been in the garage or near the door to the garage at the time of Asmus' shooting. Information obtained during the investigation suggested that on the date in question, Brooks and Asmus got into an argument, during which Brooks grabbed Asmus by the hair and threw him to the floor. A few minutes later, Asmus was apparently seated on a stool and Brooks fired a shot toward Asmus' feet and then shot Asmus in the leg. Two other suspects apparently also fired shots at Asmus, and one of the shots struck Asmus in the head. Throughout the investigation, Brooks denied possessing a gun or shooting Asmus.

On or around September 3, 2011, OPD Sgt. Donald Ficenec was contacted by an attorney, Bill Eustice, who indicated that he represented Brooks and that Brooks "wanted to come make a statement to the Omaha police," but Eustice was at that time out of town and wanted to arrange a statement for the following week. Prior to arrangements' being made and Brooks' making a statement, however, OPD officers obtained and executed an arrest warrant.

OPD officers executed the arrest warrant on September 10, 2011. After conducting surveillance on a location at which they believed Brooks to be located, officers identified Brooks getting into a vehicle. As officers approached, Brooks ran. Numerous officers gave chase and eventually apprehended Brooks. A search of Brooks' person and the area through which he had run resulted in the location of drugs, cash, and a gun.

On September 11, 2011, after being arrested and booked, Brooks indicated to corrections officers that he wished to speak to OPD officers. Brooks was transported to an OPD interview room. In light of the fact Brooks' attorney, Eustice, had contacted Ficenec previously, as noted above, Ficenec called Eustice and allowed Brooks to speak with Eustice on the telephone, privately, prior to any OPD interview of Brooks. After Brooks finished speaking with Eustice, Brooks gave the telephone to Ficenec and Eustice indicated to Ficenec that "Brooks had indicated to [Eustice] that he was going to tell [OPD officers] the same information that . . . Brooks had

already told . . . Eustice." After Brooks spoke with Eustice, he was advised of his *Miranda* rights and was interviewed by another OPD officer.

During the September 11, 2011, interview, Brooks maintained repeatedly that he had not possessed a gun at the time that Asmus had been shot. The OPD officer who interviewed Brooks indicated that throughout the interview, Brooks "changed his statement several times about where he was in the garage when all this happened," but the officer agreed that Brooks had not changed his statement in terms of not possessing a gun. During the interview, Brooks minimized his involvement. Although Brooks may have made a statement during the interview concerning being caught with a gun at the time of his arrest, the record indicates that the gun located at the time of Brooks' arrest was not one of the guns used to shoot Asmus.

Brooks also spoke with OPD officers in interviews that occurred on October 30 and December 22, 2011. Both times, in events comparable to the September 11 interview, Brooks requested to speak with OPD officers despite having counsel. Ficenec indicated that Brooks contacted him approximately 13 times between late October and December 2011. During the October and December interviews, Brooks continued to maintain that he had not possessed a gun on the date of the homicide.

In February 2012, Eustice was allowed to withdraw from representing Brooks. Another attorney entered an appearance on behalf of Brooks. In August, this second attorney was allowed to withdraw from representing Brooks. A third attorney was appointed to represent Brooks. Additionally, another attorney appeared as cocounsel with the third attorney on behalf of Brooks.

In July 2012, during the second attorney's argument to the court concerning his request to withdraw from representation of Brooks, he indicated that he had given Brooks a copy of police reports concerning the investigation into Brooks' case. Brooks' personal possession of police reports while incarcerated was contrary to a "Receipt of Discovery" agreement that had been signed on behalf of Eustice, during his

representation of Brooks, and signed by the second attorney during his representation of Brooks. The State alleged that Brooks' personal possession of police reports violated "office policies and create[d] a risk of witness interference, harassment and tampering." As a result, the State contacted the Douglas County Department of Corrections and asked that all police reports be confiscated from Brooks' possession. The confiscated materials were then sealed and eventually turned over to the State.

The State then attempted to have Brooks' then-counsel in *State v. Brooks, post* p. 435, ___ N.W.2d ___ (2014), the aforementioned third attorney (who had not yet been appointed in the instant case), review the materials and remove any work product. The sealed materials were opened, and the attorney was requested to take possession of the materials and remove any work product; he refused to take possession of the materials. The materials were then locked in an evidence room.

In July 2012, Brooks filed a second amended motion to suppress, in which he sought to suppress, "from use against [Brooks], any and all evidence contained in the police reports associated with" the instant case. Brooks alleged that a variety of his constitutional rights had been violated by the confiscation of police reports from his cell. In August, the State filed a motion seeking to have Brooks compelled to review the confiscated material and remove any work product.

At a hearing on Brooks' motion to suppress evidence contained in the police reports, Brooks testified at length about the police reports that had been confiscated from his possession. He testified that he had previously reviewed the police reports with his counsel, that together they had made notes and underlined information on the police reports, and that the reports had his "writing, underlining and notes written on almost every page." When Brooks was shown the reports confiscated from his possession, he testified that a number of pages appeared to be missing.

The two exhibits that compose the reports confiscated from Brooks' possession are together more than 500 pages in length. Although the testimony before the trial court reflected

that the reports were contained in a variety of "envelopes" and were testified to in conjunction with references to the reports in each of approximately nine envelopes, the exhibits presented to this court on appeal do not contain those envelopes and, instead, include simply a series of police reports with a blank blue sheet inserted occasionally between them, throughout; our review suggests that the blue sheets and the contents between them do not correspond to any particular envelopes or to any indication of the specific reports within a particular envelope as testified to before the trial court. A review of the police reports presented to this court indicates that few of the more than 500 pages include any kind of markings, and the markings that do appear generally consist of either underlining of small portions of a report or a handwritten reference, at the top of a page, to the name of the particular witness that the report concerns.

At the conclusion of the hearing on Brooks' motion to suppress, the trial court expressed confusion about what Brooks was seeking to suppress. When the court specifically asked Brooks' counsel what he was seeking to suppress, counsel indicated, "the evidence that is contained in the police reports." The court indicated that it was not going to suppress all of the evidence contained in police reports on the basis of copies of the reports' being confiscated from Brooks. The court ultimately granted the State's motion to compel and denied Brooks' motion to suppress.

Brooks pled not guilty to an amended information charging him with manslaughter, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Brooks waived his right to a jury trial, and the case was tried to the court. The State offered the police reports dealing with the investigation into the homicide involving Asmus. The court found Brooks guilty on all charges. Brooks was sentenced, and this appeal followed.

### III. ASSIGNMENTS OF ERROR

In this appeal, Brooks has assigned three errors. First, Brooks asserts that "[t]he trial court erred in failing to suppress the evidence obtained during Brooks' September 11,

2011 interview." Second, Brooks asserts that his case should be dismissed as a result of the State's confiscation of the police reports that had been in his possession; alternatively, he asserts that he should be granted a new trial. Third, Brooks asserts that his "respective trial counsels [sic] provided prejudicial ineffective assistance."

## IV. ANALYSIS

### 1. September 11, 2011, Interview

Brooks first assigns as error that the district court erred "in failing to suppress the evidence obtained during Brooks' September 11, 2011 interview." The record demonstrates that Brooks was advised of his rights, was afforded the opportunity to speak with his counsel, initiated contact with law enforcement, and voluntarily waived his right to counsel. This assigned error is without merit.

[1-3] In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court sought to protect the Fifth Amendment privilege against compelled self-incrimination from the inherently compelling pressures of custodial interrogation. *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012). To do so, the Court required law enforcement to give a particular set of warnings to a person in custody before interrogation: that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to an attorney, either retained or appointed. *Id*. While the particular rights delineated under *Miranda* are absolute, the language used to apprise suspects of those rights is not. *State v. Nave, supra*. The inquiry is simply whether the warnings reasonably convey to a suspect his rights. *Id*.

[4-7] The U.S. Supreme Court has noted that once the adversary process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *Montejo v. Louisiana*, 556 U.S. 778, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009). Interrogation by the State is such a stage. *Id*. The Sixth Amendment right to counsel may be waived by a defendant, so long as the relinquishment of the right is voluntary,

knowing, and intelligent. *Montejo v. Louisiana, supra*. When a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically "does the trick," even though the *Miranda* rights purportedly have their source in the Fifth Amendment. *Montejo v. Louisiana*, 556 U.S. at 786. As a general matter, an accused who is admonished with the warnings prescribed in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one. *Montejo v. Louisiana, supra*, quoting *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988).

In this case, Brooks was read his rights verbatim from the OPD's rights advisory form, *after* he had already been afforded the opportunity to speak to his counsel. Brooks indicated that he understood his rights and proceeded to speak with officers. The warnings were reasonably conveyed to Brooks, he actually spoke with counsel, and he waived his rights.

[8] In *Montejo v. Louisiana, supra*, the Court recognized that once an accused has invoked his right to counsel, he is not subject to further interrogation by the authorities until counsel has been made available, *unless he initiates the contact*. See, also, *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Brooks points to *Edwards* as support for his argument that he had invoked his right to counsel and that the right was infringed by the September 11, 2011, interrogation. We disagree.

The record in this case is clear. Brooks initiated the contact with law enforcement before each interview, including the September 11, 2011, interview. Indeed, at the time of the September 11 interview, Brooks requested to speak to law enforcement and law enforcement contacted Brooks' counsel and had Brooks speak with his counsel. Brooks indicated a desire to speak with law enforcement after speaking with his counsel and affirmatively waived his rights.

Brooks argues on appeal that evidence should have been suppressed because his waiver was limited to an authorization "to elicit a specific statement regarding the homicide" and that

the specific statement was an exculpatory statement. Brief for appellant at 9. Specifically, Brooks argues in his brief that law enforcement "accepted Brooks' subsequent waiver of his [*Miranda*] rights after [counsel] advised both Brooks and [law enforcement] that police were authorized to elicit a specific statement regarding the homicide charged in the instant case." *Id*. The record does not support this assertion.

The portion of the record cited by Brooks in support of the above assertion does not include any such testimony. Rather, the record indicates that Ficenec spoke with Brooks' counsel, Eustice; that Eustice did not communicate any issues or problems with an interview of Brooks; and that Eustice indicated that Brooks "was going to tell [law enforcement] the same information that [he] had already told" Eustice. Ficenic testified that Eustice did not put any parameters on the interview that was to take place and did not indicate that anything was "off limits." Eustice also testified, but he did not testify that he put any restrictions or limitations on the interview of Brooks.

Eustice was asked if, during his telephone conversation with Brooks on September 11, 2011, any information was given to him "about [Brooks'] actually being in the homicide interrogation room and being under arrest for murder," and Eustice indicated that although "[n]othing specifically" had been said, he "just assumed that [Brooks] was" because Ficenec had initiated the telephone call. Eustice also testified that his "reasoning behind suggesting that . . . Brooks talk to [officers] is because [Brooks'] version of what occurred was exculpatory."

Brooks repeatedly asserts throughout his argument that OPD officers violated his rights and did not effectively make counsel available because they "knowingly exceeded the scope of the authorization granted . . . by Eustice when [they] rejected the specific statement authorized by Eustice and elicited incriminating statements regarding the homicide." Brief for appellant at 9. Brooks argues that officers "failed to recognize or failed to honor the limitations placed on the interview by Eustice" and that the information Eustice authorized officers to get from Brooks "consisted of a specific

exculpatory statement concerning the homicide." *Id*. at 11 and 12. The record presented by Brooks, however, does not support this suggestion.

Finally, we note that although the interviews of Brooks were recorded, sometimes with both audio and visual recording and sometimes with only audio recording, the actual recordings of the interviews were not offered as evidence in the bench trial. Rather, the State offered two exhibits which comprised the police reports regarding the homicide and the autopsy report. Those police reports do include references to the statements Brooks made during the interviews, but the totality of the interviews was never offered or received as evidence in the bench trial.

In this case, Brooks initiated contact with law enforcement, was afforded the opportunity to speak with his counsel, was advised of all of his rights, and voluntarily waived those rights. The district court did not err in overruling the motion to suppress.

## 2. Confiscation of Police Reports

Brooks next assigns as error that the charges brought against him "should be dismissed because the State violated Brooks' constitutional right to private communications with counsel when it raided Brooks' cell without his knowledge and confiscated his confidential work product." In the alternative, Brooks seeks to have the convictions reversed and the matter remanded for a new trial. This assigned error is meritless.

As noted above in the background section, during the course of these proceedings, one of Brooks' attorneys provided him with copies of police reports, in violation of Douglas County policies and discovery agreements signed by Brooks' counsel. The State then had law enforcement confiscate the materials and took steps to have Brooks' counsel review the materials and remove any work product. The evidence adduced at trial uniformly indicated that the State never looked at any of the materials and was not aware of whether any work product appeared on any of the materials.

Brooks argues that the privacy of his communications with his counsel was violated because the confiscated materials included "work product generated by Brooks both independently and during meetings with his attorney." Brief for appellant at 17. Brooks urges us to reach a conclusion similar to that of the California Supreme Court in *Barber v. Municipal Court, etc.*, 24 Cal. 3d 742, 598 P.2d 818, 157 Cal. Rptr. 658 (1979). We decline to do so.

In *Barber v. Municipal Court, etc.*, participants of a "sit-in" near a nuclear power facility as a demonstration of opposition to the use of nuclear power were charged with trespassing and unlawful assembly. As it turned out, one of the codefendants was actually an undercover police officer, who had become intimately involved with the group and attended numerous planning meetings. After the participants were arrested, attorneys arrived at the jail and conducted a confidential attorney-client conference with the arrestees, including the undercover officer. The undercover officer was present for the confidential attorney-client conference with the defendants and testified that he was sure defense strategy had been discussed, but that he had not paid close attention.

At or around the time of the defendants' arraignment, the presiding judge and the prosecuting attorney were informed that one of the defendants was an undercover officer, but defense counsel was not informed. The undercover officer continued to pose as a codefendant with the defendants and as a client of defense counsel. He attended numerous confidential attorney-client conferences that included detailed discussions about the case and defense strategy. He participated in discussion about the defense.

Throughout the pretrial proceedings, the undercover officer reported to his superiors. His superiors testified that they could not remember what information he had conveyed to them, but that they were sure he had given them no information about defense strategy.

At some point, approximately 2 months after the arrests, the undercover officer's identity as an undercover officer was made known to defense counsel and to the defendants. Evidence indicated that after this information was revealed,

the defendants became paranoid, distrustful of one another and their counsel, and reluctant to actively participate in preparing a defense.

The defendants filed a motion seeking to have the charges dismissed. The trial court denied the motion on the ground that there was no evidence any confidential information had been transmitted to the prosecution, but ordered suppression of any evidence gained from the undercover officer or derived from his presence at any meetings between the defendants and their counsel.

[9,10] On appeal, the California Supreme Court reversed. *Id*. The court recognized that inherent in the Sixth Amendment right to counsel is the assurance of confidentiality and privacy of communication with counsel. Thus, the court held that the right to counsel is violated "when a state agent is present at confidential attorney-client conferences." *Barber v. Municipal Court, etc*., 24 Cal. App. 3d at 752, 598 P.2d at 823, 157 Cal. Rptr. at 663.

The California Supreme Court, relying heavily on the evidence of the impact on the relationship between the defendants and their counsel of discovering the undercover officer's true identity, concluded that on the facts of that case, dismissal was the only appropriate remedy. *Id*.

The present case, however, is substantially distinguishable. This case does not involve any situation where any representative of the State was "sitting in on" any conversations between Brooks and counsel. The present case does not present a situation where any member of the prosecution or the investigating officers was privy to any discussions between Brooks and his counsel or aware of any aspects of defense strategy. The unrefuted evidence in this case is that once the materials were confiscated, nobody associated with the State actually read or reviewed any of the contents of the materials.

In this case, Brooks did not move for dismissal at the trial level. Rather, he moved that "any evidence contained in the police reports, . . . containing [Brooks'] protected defense work product, be excluded from use against him at trial." Although it was not entirely clear what relief Brooks was seeking at trial and the trial court expressed confusion

about the relief being sought, there was no request for dismissal of any charges. Brooks has not assigned as error the district court's denial of the relief he actually requested at trial, suppression.

We are thus left with a situation where Brooks requested a particular relief at trial, was denied that relief, and has not assigned error to the denial of that relief, but where he asserts on appeal that the district court erred in not granting other relief that was never requested. The only way this assigned error could be found to have merit would be on the basis of a finding of plain error.

To the extent Brooks appears to have requested the trial court to suppress the entire contents of all police reports in this case because copies of them were confiscated from his cell—confiscated on the basis that his possession thereof violated Douglas County policies and disclosure agreements signed by his counsel—we find no plain error in the district court's denial of the motion.

To the extent Brooks seeks to have us grant relief never requested below, either in the form of dismissal of all charges or in the form of a new trial, we similarly find no plain error meriting such relief. The record in this case is clear that the State did not look at any of the confiscated materials to determine any content therein, contrary to the undercover officer's continued participation and awareness of specific defense strategies in *Barber v. Municipal Court, etc.*, 24 Cal. 3d 742, 598 P.2d 818, 157 Cal. Rptr. 658 (1979). Moreover, although the confiscated materials are presented as exhibits that together appear to be at least 500 pages in length, our review of the materials indicates that there is little to no information contained therein that was added to the original reports by Brooks or his counsel. Indeed, the most that can be said about the confiscated reports appears to be that someone underlined some portions of witness testimony on a handful of the police reports and wrote the name of particular witnesses who are mentioned in the reports at the top of a handful of pages. The vast majority of the 500 or more pages contain absolutely no markings whatsoever.

The denial of the relief requested at trial has not been appealed to us. The relief urged on appeal was not requested at trial. We find no plain error and find this assigned error to be meritless.

### 3. Assistance of Counsel

Finally, Brooks assigns as error that his "respective trial counsels [sic] provided prejudicial ineffective assistance." He argues that "all of his trial counsels [sic]" provided ineffective assistance "at various points throughout the proceedings." Brief for appellant at 23. Brooks asserts that his trial attorneys were ineffective in a variety of ways, including failing "to independently interview, depose, or subpoena" a variety of witnesses, and that Eustice was ineffective in advising Brooks to speak with police without his presence on several occasions. *Id.* at 25. We find that these assertions cannot properly be considered in this direct appeal.

[11] The test for ineffective assistance of counsel is well settled. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[12-14] On direct appeal, the resolution of ineffective assistance of counsel claims turns upon the sufficiency of the record. *Id.* The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. *Id.* This is because the trial record reviewed on appeal in a criminal case is devoted to issues of guilt and innocence and does not usually address issues of counsel's performance. *Id.*

[15-17] A defendant alleging that trial counsel was ineffective is required to specifically assign and argue his trial counsel's allegedly deficient conduct. *Id.* On direct appeal, an appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial

counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance. *Id*. Specific allegations of prejudice, however, are not required when the issue is raised on direct appeal. *Id*.

In this case, the record presented on direct appeal is not sufficient for us to resolve Brooks' assertions that his trial counsel performed ineffectively. Although Brooks asserts that counsel performed ineffectively in failing to independently interview, depose, or subpoena a variety of witnesses, there is no record presented to us to demonstrate that counsel actually did fail to interview or depose any of the witnesses. Although Brooks makes assertions in his brief about what the various witnesses would have testified, there is obviously no record to support his assertions or to indicate what any of the witnesses might have testified.

Finally, although the record does indicate that Eustice advised Brooks to speak with law enforcement without his presence, the record has not been developed to fully indicate Eustice's motivations for such a decision, beyond his expectation that Brooks would provide an exculpatory statement. Moreover, it is not apparent from the record presented how Eustice's advice in this regard resulted in prejudice, inasmuch as there was substantial evidence adduced to the trial court concerning Brooks' involvement in the homicide.

On the record presented on direct appeal, we cannot find that Brooks' trial counsel performed deficiently or that any alleged deficient performance prejudiced Brooks' defense. At this time, the record is insufficient to further address the merits of Brooks' assertions about the effectiveness of his counsel.

## V. CONCLUSION

We find no merit to Brooks' assertions on appeal. We affirm.

Affirmed.